

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-24-2001

# Citizens Publishing v. NLRB

Precedential or Non-Precedential:

Docket 00-2825 & 00-3758

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Citizens Publishing v. NLRB" (2001). *2001 Decisions.* Paper 192.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/192

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 24, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2825/00-3758

CITIZENS PUBLISHING AND PRINTING COMPANY;
W. RYAN KEGEL; SCOTT KEGEL, Alter Egos,

      Petitioners/Cross-Respondents,

v.

NATIONAL LABOR RELATIONS BOARD,

      Respondent/Cross-Petitioner

ON PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

(Cases 6-CA-27215, 6-CA-28147-1, 6-CA-28147-2,
6-CA-27832-2)

Argued: April 19, 2001

Before: SLOVITER, RENDELL, and FUENTES,
Circuit Judges

(Opinion Filed: August 24, 2001)

Robert E. Durrant (argued)
Campbell, Durrant & Beatty, P.C.
555 Grant Street, Suite 120
Pittsburgh, PA 15219-4408

Philip L. Clark, Jr.
Balph, Nicolls, Mitsos, Flannery &
 Clark
400 Sky Bank Building
14 North Mercer Street
New Castle, PA 16101

 ATTORNEYS FOR PETITIONERS/
CROSS-RESPONDENTS

Leonard R. Page
 Acting General Counsel
John H. Ferguson
 Associate General Counsel
Aileen A. Armstrong
 Deputy Associate General Counsel
Meredith Jason
 Supervisory Attorney
Charles P. Donnelly
 Attorney
Rachel Gartner Lennie
 Attorney
Fred B. Jacob (argued)
 Attorney
National Labor Relations Board
1099 14th Street, N.W.
Washington, DC 20570

 ATTORNEYS FOR RESPONDENT/
CROSS-PETITIONER

2

OPINION OF THE COURT

FUENTES, Circuit Judge:

Citizens Publishing and Printing Company and the two brothers who operate it, W. Ryan Kegel ("RKegel") and Scott R. Kegel ("SKegel"), filed a Petition for Review of a final decision and order of the National Labor Relations Board ("Board"). The Board has filed a Cross-Application for Enforcement. We have been asked to review (1) whether Petitioners (collectively, "Citizens Publishing") committed an unfair labor practice by unilaterally subcontracting night and weekend photography work to independent contractors, and (2) whether the labor strike was an"unfair labor practice strike," rather than a mere economic strike. We conclude that substantial evidence supports the Board's affirmative findings as to both inquiries, as well as its additional finding that Citizens Publishing falsely informed the union that the striking employees had been permanently replaced, thereby failing to reinstate the strikers immediately upon their unconditional offer to return to work. Therefore, we will deny the petition and grant the cross-application. Further, because neither party challenges the propriety or scope of the relief ordered by the Board, we will enforce the Board's order in its entirety.

I.

A.

The facts germane to the issues on appeal are as follows. Citizens Publishing and Printing Company is a family-owned corporation, which publishes, circulates, and distributes the Ellwood City Ledger, a daily newspaper, and the Valley Tribune, a weekly newspaper. RKegel is the vice-president and publisher with overall responsibility for the company. SKegel is the general manager, who, together with RKegel, is responsible for all day-to-day operations. Each brother owns one-third of the company's stock.

3

Before 1993, Citizens Publishing had employed Bud Dimeo as its sole full-time photographer for over 35 years. Dimeo performed regular daytime photography work. To cover the night/weekend work, Citizens Publishing had used several stringers over the years, sometimes hiring three to four at a time. Stringers are independent contractors who contribute stories and/or who take photographs for the newspaper on an ad hoc basis. They are paid by-the-line for articles or a flat fee for each photo.

At some point in 1993, daytime photography work began to decline for Dimeo such that sufficient work to sustain a full-time photographer position no longer existed. As a result, in August 1993, Citizens Publishing assigned night/weekend work to Dimeo as part of his regular duties. From August 1993 until his retirement in January 1995, Dimeo was responsible for the majority of the newspaper's night/weekend work. Because the night/weekend work was part of his full-time duties, Dimeo did not receive any additional compensation for these photographs. During this same time, the full-time sports editor, Mark Crepp, also expressed an interest in earning extra money. Citizens Publishing thus assigned night/weekend work to him as well, paying him a per picture rate. Additionally, Citizens Publishing continued to hire stringers to perform night/weekend work.

On December 28, 1993, Teamsters Local Union No. 261 ("Union") was certified as the exclusive collective bargaining representative for certain employees of the company. This certified bargaining unit did not include stringers. In early 1994, the Union and Citizens Publishing began negotiating for an initial collective-bargaining agreement. During the negotiations, the parties discussed Citizens Publishing's use of stringers but did not resolve the matter. On June 3, 1994, the parties agreed that, while the negotiations progressed, Citizens Publishing would continue its past practice. The next day, the Union requested that Citizens Publishing hire a stringer to do night/weekend work in order to enable Dimeo to spend more time with his ailing wife. Citizens Publishing refused, insisting that it was not going to give Dimeo full-time pay to work part-time.

4

When Dimeo retired in January 1995, Citizens Publishing assigned Crepp to be the temporary full-time photographer. In addition to his new photography duties, Crepp also alternated as a weekend sports editor, writing sports stories and assisting with the layout of the sports section. He also worked on an annual business supplement published by Citizens Publishing. In March 1995, Crepp informed company management that he was having difficulty completing the night/weekend work that Dimeo had previously performed. In response, Citizens Publishing hired several stringers to cover the night/weekend work. Citizens Publishing informed Crepp that the stringers would perform most of the photography work, but that Crepp would continue to take sports photographs on nights and weekends. Citizens Publishing neither notified the Union of its decision to subcontract the night/weekend photography work previously assigned to Dimeo nor gave the Union the opportunity to bargain over this decision.

At the parties' next negotiating session, on April 11, 1995, the Union asserted that Citizens Publishing had unilaterally removed photography work from the bargaining unit by subcontracting the night/weekend work. The Union asked Citizens Publishing to rescind its action, but the company refused. On April 18, the Union filed an unfair labor practice charge with the Board, alleging that Citizens Publishing, in subcontracting night/weekend work, had unilaterally changed the terms and conditions of employment without bargaining, as required under federal labor law.

On July 21, 1995, the Union learned that the Board intended to issue a complaint based upon the Union's unfair labor practice charge. Two days later, the Union met with the employees and informed them of Citizens Publishing's unilateral change and its refusal to rescind its action, as well as the impending Board complaint. After learning of Citizens Publishing's unfair labor practice, numerous employees indicated their desire to go on strike, and the membership held a strike vote. The membership voted to strike and left work the next day, July 24.

After the bargaining unit employees went on strike, Citizens Publishing continued to publish its newspapers,

5

relying on the assistance of family members, supervisory employees, and a few non-striking bargaining unit employees. Eventually, Citizens Publishing hired temporary replacement workers. On January 5, 1996, the Union contacted Citizens Publishing, seeking to resume bargaining and requesting information concerning the replacements. On February 22, the Union requested additional information, advising Citizens Publishing that the information was necessary "in the event that our members make an unconditional offer to return to work." By letter dated March 5, Citizens Publishing responded, asserting that "[n]one of the temporary replacements are considered to be permanent replacements."

The parties then scheduled a bargaining session for March 14, 1996. Two days earlier, RKegel and SKegel had met with Donald Smith, a management consultant representing Citizens Publishing in its negotiations with the Union. At that meeting, the Kegels had informed Smith that they were happy with the replacement employees' job performance and that, if he could not reach an agreement with the Union soon, they would favor the permanent replacement of the strikers. The next day, on March 13, the Kegels and Smith drafted a letter from RKegel to Smith, stating that Citizens Publishing believed the strike was an economic strike, and that the company considered the temporary replacements "to be regular permanent replacement employees," namely, that the strikers were being permanently replaced.

When the parties met on March 14, Smith began the session by stating that he understood that the Union planned to make an unconditional offer to return to work that day. The Union representative responded affirmatively but indicated that he also needed some additional information. The parties discussed several issues, including the wages that the strikers would receive upon their return. When the Union sought a list identifying the replacement workers and the jobs that they performed, Citizens Publishing requested a caucus to consider the Union's request.

During the caucus, Smith and SKegel met with RKegel at a nearby restaurant. When Smith and SKegel reported that

6

the negotiations were not progressing, RKegel instructed them to give the Union the March 13 letter indicating that the replacements were considered permanent. When Smith and SKegel returned to the bargaining session, they gave the Union the March 13 letter. The bargaining session ended shortly thereafter. At that time, Citizens Publishing had not yet contacted the replacement employees regarding any change in their employment status. Citizens Publishing only advised its replacements on the next day, March 15, that they were now viewed by company management as permanent replacements.

Although the Union requested additional bargaining dates, Citizens Publishing did not meet with the Union again until May 13, 1996. That meeting resulted in a brief, non-productive session. On May 15, the Union's president sent Smith a letter, stating that he wished to "reconfirm" that "each of the employees represented by Local 261 is making an unconditional offer to return to work, at all times since March 14, 1996." Citizens Publishing never allowed the striking employees to return to their jobs, and the parties did not reach a collective-bargaining agreement.

B.

Several labor cases arose from the foregoing factual background. They were ultimately consolidated and tried in October 1996 before an Administrative Law Judge ("ALJ"), who issued his decision on June 30, 1997. The ALJ concluded, among other things, that Citizens Publishing had violated SS 8(a)(5), 8(a)(3), and 8(a)(1) of the National Labor Relations Act ("Act") by: (1) unilaterally subcontracting the night/weekend work of the full-time photographers to stringers; (2) falsely informing the strikers that they had been permanently replaced; and (3) failing to reinstate the strikers immediately upon their unconditional offer to return to work.

After Citizens Publishing filed exceptions to the ALJ's decision, a three-member panel of the Board (with one member dissenting) issued its decision and order on August 31, 2000, affirming the ALJ's rulings, findings, and conclusions, as modified, and adopting a modified order.

7

The Board ordered Citizens Publishing to cease and desist from: (1) unilaterally subcontracting night/weekend work performed by the regular, full-time photographer; (2) unlawfully discharging strikers and failing to reinstate them; and (3) interfering with, restraining, or coercing employees in the exercise of their statutory rights. The Board also affirmatively ordered Citizens Publishing, among other things, to: (1) restore the status quo with respect to the night/weekend work performed by the regular, full-time photographer before April 15, 1995; (2) offer full reinstatement to the unfair labor practice strikers; (3) make the unfair labor practice strikers whole for any loss of earnings or other benefits suffered; and (4) post a remedial notice.

Citizens Publishing thereafter filed a Petition for Review in this Court on September 27, 2000, seeking to set aside the Board's decision. The Board also filed a Cross-Application for Enforcement on November 9, 2000. The Clerk's Office assigned the cases separate docket numbers, but, because they raised identical issues, we consolidated them for appeal purposes.

II.

The Board exercised jurisdiction over this proceeding under 29 U.S.C. SS 160(a), (b). The Board's decision and order was a final order with respect to all the parties. See id. S 160(c). As the alleged unfair labor practice occurred within this Circuit, we may exercise jurisdiction over the petition and the cross-application for enforcement under 29 U.S.C. SS 160(e) and (f). Both the petition and cross-application were timely filed as the Act places no time limit on such filings. See Schaefer v. NLRB, 697 F.2d 558, 560–61 (3d Cir. 1983).

On review, we "accept the Board's factual determinations and reasonable inferences derived from factual determinations if they are supported by substantial evidence." CPS Chem. Co. v. NLRB, 160 F.3d 150, 154 (3d Cir. 1998) (internal quotations and citation omitted); accord 29 U.S.C. SS 160(e), (f); Universal Camera Corp. v. NLRB, 340 U.S. 474, 487–88 (1951). Substantial evidence is"more

8

than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera, 340 U.S. at 477 (internal quotations and citation omitted). Accordingly, to support the Board's conclusion, the evidence "must do more than create a suspicion of the existence of the fact to be established. . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." Id. (internal quotations and citation omitted). However, we will not disturb the Board's factual inferences, even if we would have made a contrary determination had the matter been before us de novo. Id. at 488; Hedstrom Co. v. NLRB, 629 F.2d 305, 313-14, 316 (3d Cir. 1980) (en banc).

Further, our review is plenary over the Board's legal analysis but, "[b]ecause of the Board's `special competence' in the field of labor relations, its interpretation of the Act is accorded substantial deference." Pattern Makers' League of N. Am. v. NLRB, 473 U.S. 95, 100 (1985). That is, we will uphold the Board's interpretations of the Act if they are reasonable. Ford Motor Co. v. NLRB, 441 U.S. 488, 497 (1979); Resorts Int'l Hotel Casino v. NLRB, 996 F.2d 1553, 1556 (3d Cir. 1993).

A.

We first address whether Citizens Publishing committed an unfair labor practice by unilaterally subcontracting night/weekend work to stringers.

Under S 8(a)(5) of the Act, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C.S 158(a)(5). Further, S 8(a)(5), as augmented by S 8(d), requires an employer to bargain over "wages, hours, and other terms and conditions of employment." Id. S 158(d). Accordingly, an employer violates S 8(a)(5) "if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 198 (1991); accord Hedstrom Co. v. NLRB, 629 F.2d 305, 317 (3d Cir. 1980) (en banc). By unilaterally

9

changing the employees' terms and conditions of
employment, an employer "minimizes the influence of
organized bargaining" and "emphasiz[es] to the employees
that there is no necessity for a collective bargaining agent."
May Dep't Stores Co. v. NLRB, 326 U.S. 376, 385 (1945). By
doing so, the employer also derivatively violatesS 8(a)(1) of
the Act, which makes it an unfair labor practice"to
interfere with, restrain, or coerce employees in the exercise
of " their statutory federal labor rights. 29 U.S.C.
S 158(a)(1).

When parties are engaged in negotiations for an initial
collective-bargaining agreement, the prohibition against
unilateral changes continues "unless and until an overall
impasse has been reached on bargaining for the agreement
as a whole." Master Window Cleaning, Inc., 302 N.L.R.B.
373, 374 (1991), enforced, 15 F.3d 1087 (9th Cir. 1994);
accord NLRB v. Katz, 369 U.S. 736, 742-48 (1962) (holding
that an employer violates the Act by undertaking unilateral
action while the parties are engaged in bargaining for an
initial collective-bargaining agreement). The allocation of
bargaining unit work is a term or condition of employment.
See Road Sprinkler Fitters Local Union No. 669 v. NLRB, 676
F.2d 826, 831 (D.C. Cir. 1982). Accordingly, an employer
violates SS 8(a)(5) and 8(a)(1) by unilaterally diverting or
subcontracting work allocated to the bargaining unit at the
time of the union's certification. See, e.g., Acme Die Casting,
315 N.L.R.B. 202, 202 n.1 (1994) (holding that the
employer violated the Act by subcontracting unit work
while the parties were negotiating for an initial collective-
bargaining agreement); cf. Adair Standish Corp. v. NLRB,
912 F.2d 854, 863-64 (6th Cir.) (holding that the employer
violated the Act by instituting changes in the employees'
schedules following the union's certification), enforced, 914
F.2d 255 (6th Cir. 1990). By contrast, where an employer's
action does not involve a unilateral change in the status
quo, but rather, a continuation of an uninterrupted,
established past practice, its action does not violate the Act.
See, e.g., Bryant & Stratton Bus. Inst. v. NLRB, 140 F.3d
169, 175-76 (2d Cir. 1998) (holding that the employer did
not violate the Act where its required use of a sign-in board
was a "reaffirmation of its previous policy and not a change

10

in the employee's terms and conditions of employment of unit employees").

Here, substantial evidence supports the Board's finding that, as of August 1993, Citizens Publishing's night/weekend work became "an integral part of the regular full-time photographer's work," and thus, became bargaining unit work. The record plainly reveals that, by 1993, the workload of the full-time photographer had declined to the point that there was not enough work to sustain the full-time position. Thus, in August 1993, when Citizens Publishing assigned the night/weekend work to Dimeo, that work became a necessary and integral part of the full-time photographer's position. Indeed, Citizens Publishing's refusal to have night/weekend work removed from Dimeo's duties, and its concomitant insistence to the Union that it would not give Dimeo full-time pay for part-time work, exemplify this change. Additionally, Dimeo did not receive any additional remuneration for his night/weekend work. These facts support the Board's finding that Citizens Publishing "made [night/weekend] work part of the regular duties of the full-time photographer." Thus, at the time of the Union's certification in December 1993, the status quo included a full-time photographer's position with night/weekend work. Accordingly, substantial evidence supports the determination that Citizens Publishing violated the Act when it unilaterally subcontracted the bargaining unit work during the negotiations over the initial collective-bargaining agreement.

Citizens Publishing contends that substantial evidence does not support the Board's decision that it had committed an unfair labor practice because it was merely adhering to a well established past practice when it utilized stringers after August 1993. This contention, however, fails to recognize that status quo is determined as of the time of a union's certification. See, e.g., NLRB v. Talsol Corp., 155 F.3d 785, 794 (6th Cir. 1998); Anchortank, Inc. v. NLRB, 618 F.2d 1153, 1156-57 (5th Cir. 1980). Thus, although Citizens Publishing had used stringers to perform a small part of the night/weekend work, that work had become an integral part of the full-time photographer's job at the time

11

of the Union's certification in December 1993. In other words, it had become bargaining unit work. For this reason, the Board reasonably focused on the duties of the full-time photographer, rather than the stringers, thereby finding that, by removing work from that bargaining unit position, Citizens Publishing had unilaterally changed the terms and conditions of the full-time photographer's employment. Accordingly, contrary to its contention, Citizens Publishing's action was inconsistent with a past practice and violated SS 8(a)(5) and 8(a)(1) of the Act.

Therefore, substantial evidence supports the Board's decision that Citizens Publishing committed an unfair labor practice when it unilaterally subcontracted night/weekend work to stringers.

B.

We next address whether the strike was an "unfair labor practice strike," as opposed to a mere economic strike.

The right of employees to engage in a lawful strike is a fundamental provision of the Act. See NLRB v. Erie Resistor Corp., 373 U.S. 221, 233-35 (1963); NLRB v. Int'l Rice Milling Co., 341 U.S. 665, 672-72 & nn. 6-8 (1951); see also 29 U.S.C. S 163 ("Nothing in [the Act], except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."). All striking workers retain their status as "employees" under the Act. See 29 U.S.C. S 152(3). Striking workers fall within two categories: (1) unfair labor practice strikers, who are motivated, at least in part, by their employer's commission of an unfair labor practice; and (2) economic strikers, who are striking over recognition or bargaining demands. General Indus. Employees Union, Local 42 v. NLRB, 951 F.2d 1308, 1311-12 (D.C. Cir. 1991).

One difference between these two categories is that the former enjoys greater reinstatement rights. Specifically, unfair labor practice strikers are entitled to immediate reinstatement upon their unconditional offers to return to work; any replacements hired during the strike must be dismissed, if necessary, to effect reinstatement of the

12

strikers. Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278 (1956); Hajoca Corp. v. NLRB, 872 F.2d 1169, 1177 (3d Cir. 1989). By contrast, economic strikers are entitled, upon their unconditional offers to return to work, to reinstatement to their former or substantially equivalent positions, if no permanent replacements have been hired to replace them and the positions remain open. NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378-79 (1967).

An unfair labor practice strike is any strike that is caused "at least in part" by an employer's unfair labor practice. Struthers Wells Corp. v. NLRB, 721 F.2d 465, 471 (3d Cir. 1983). It is immaterial whether other reasons for a strike exist because, "if an unfair labor practice had anything to do with causing the strike," that strike is an unfair labor practice strike. NLRB v. Cast Optics Corp., 458 F.2d 398, 407 (3d Cir. 1972) (internal quotations and citation omitted). Further, a strike that begins as an economic dispute can be converted into an unfair labor practice strike if an employer's subsequent unfair labor practice aggravates or prolongs the strike. NLRB v. Frick Co., 397 F.2d 956, 964 (3d Cir. 1968). A failure to reinstate unfair labor practice strikers constitutes prohibited discrimination under SS 8(a)(3) and 8(a)(1) of the Act because it has the effect of discouraging employees from exercising their rights to organize and to strike under the Act. Mastro, 350 U.S. at 278; Struthers , 721 F.2d at 471. Whether a strike is an unfair labor practice strike is a factual issue upon which the Board's findings are conclusive if supported by substantial evidence on the record as a whole. Columbia Portland Cement Co. v. NLRB, 915 F.2d 253, 259 (6th Cir. 1990).

Here, substantial evidence supports the Board's finding that the strike was an unfair labor practice strike. The Union convened a meeting of bargaining unit members on the day before the strike began. At that meeting, the Union discussed Citizens Publishing's allegedly unlawful removal of night/weekend work from the full-time photographer's duties and notified the employees that the Board's regional office would be issuing a complaint against Citizens Publishing based upon that unfair labor practice. After learning of Citizens Publishing's action, numerous

13

employees indicated their desire to go on strike, and the membership held a strike vote. These facts support the Board's finding that its decision to issue a complaint "galvanized the bargaining unit members' belief that an unfair labor practice had been committed and served as the flashpoint for discussion about calling a strike."

Moreover, even if Citizens Publishing's subcontracting of night/weekend work did not constitute an unfair labor practice, its discharge of the striking employees on March 14, 1996 converted the strike into an unfair labor practice strike because it prolonged the strike. As the Board found, and as we explain below, Citizens Publishing's false declaration that it had permanently replaced the strikers prolonged the strike by thwarting the Union's attempt to make an unconditional offer to return to work that day. Indeed, the Union informed Citizens Publishing at the March 14 bargaining session of its intent to make an unconditional offer to return to work. Before the Union could make its offer, however, Citizens Publishing pre- emptively notified the Union that it had permanently replaced the strikers, thereby effectively informing the Union that any unconditional offer to return to work would be futile. Accordingly, the Board reasonably found that, even if the strike had begun as an economic strike, Citizens Publishing's false declaration had prolonged the strike and converted it into an unfair labor practice strike. Cf. NLRB v. Champ Corp., 933 F.2d 688, 694-95 (9th Cir. 1990) (holding that the employer's conduct effectively derailed contract negotiations, thereby prolonging the economic strike and converting it into an unfair labor practice strike).

To support its argument that the strike was a mere economic strike, Citizens Publishing contends that its unlawful subcontracting could not have had a causal connection to the decision to strike because the strike vote in July 1995 took place four months after its own action in March 1995. Citizens Publishing's argument, however, sidesteps the fact that a lapse in time between an unfair labor practice and a strike is "not conclusive in establishing the basis for a strike." Burns Motor Freight, Inc., 250 N.L.R.B. 276, 277-78 (1980). Further, it overlooks the fact that the Union did not convene its membership until the

14

Board's regional office had determined that Citizens Publishing's unlawful subcontracting was, in actuality, an unfair labor practice.

Citizens Publishing also maintains that the Union provided bargaining committee members with inaccurate and misleading information to foment the strike (namely, that Crepp would no longer be a photographer and that the company had subcontracted out all of the photography work), and thus, the strike was an economic strike, rather than an unfair labor strike. This misrepresentation, however, was insignificant because the Union only made it to the five employee members of the bargaining committee, not to the bargaining unit members as whole, and thus, its effect on the Union's membership was minimal. In any case, the record as a whole contains substantial evidence to support the Board's contrary finding that, in deciding to strike, the employees were motivated by Citizens Publishing's unfair labor practice, not by the Union's misrepresentation.

Similarly, Citizens Publishing argues that only the Union's motivation, and not the striking employees' motivation, is relevant to the Board's determination of causation. We do not agree. The Board has repeatedly relied upon evidence of the strikers' motivation to show that the strike is based, at least in part, upon the employer's unfair labor practice. Citizens Publishing has cited no authority in which the Board or courts have applied a different rule. See, e.g., Alwin Mfg. Co. v. NLRB, 192 F.3d 133, 141–42 (D.C. Cir. 1999) (holding that the striking employees' motivation for striking is central to a finding of an unfair labor practice strike); Calex Corp. v. NLRB, 144 F.3d 904, 911 (6th Cir. 1998) (holding that the employees' discussion at pre–strike meeting are significant in finding an unfair labor practice strike).

Therefore, substantial evidence supports the Board's decision that the ensuing labor strike was an "unfair labor practice strike" rather than an economic strike.

C.

Although we have determined that the striking employees had participated in an unfair labor practice strike, rather

15

than an economic strike, we also find substantial evidence in the record to uphold the Board's decision to reinstate the striking employees based upon an alternative ground. Even assuming that the strike was an economic strike, we would uphold the Board's decision because of Citizens Publishing's false representation to the Union that the strikers had been permanently replaced and its subsequent failure to reinstate them immediately upon their unconditional offer to return to work.

Under S 8(a)(3) of the Act, it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage" union membership. 29 U.S.C. S 158(a)(3). Thus, an employer violates S 8(a)(3) (and, derivatively, S 8(a)(1)) by discharging employees because of their union activity. NLRB v. Transp. Mgmt. Corp., 462 U.S. 393, 397–98, 401 (1983), overruled on other grounds, Director, OWCP v. Greenwich Collieries, 512 U.S. 267 (1994). One example of a protected union activity is "participation in concerted activities, such as a legitimate strike." NLRB v. Erie Resistor Corp., 373 U.S. 221, 233 (1963) (citation omitted); see also Div. 1287 of the Amalgamated Ass'n of Street, Elec. Ry and Motor Coach Employees of Am. v. Missouri, 374 U.S. 74, 82 (1963) ("Collective bargaining, with the right to strike at its core, is the essence of the federal scheme."); 29 U.S.C.SS 157, 163.

As we explained above, the right to strike does not prevent an employer from hiring permanent replacements during a strike. However, "[t]he discharge of. . . strikers prior . . . to the time their places are filled" violates SS 8(a)(3) and 8(a)(1). NLRB v. Int'l Van Lines, 409 U.S. 48, 52 (1972) (internal quotations and citations omitted). In order for replacement workers to be considered permanent, the employer and the replacements must have a "mutual understanding" regarding their permanent status. See, e.g., NLRB v. Augusta Bakery Corp., 957 F.2d 1467, 1473 (7th Cir. 1992). Accordingly, an employer's false declaration that strikers have been permanently replaced effectively discharges the employees because the effect of that action is to withhold from strikers "the right to return to their unoccupied jobs simply because they have gone out on

16

strike." Am. Linen Supply Co., 297 N.L.R.B. 137, 137 (1989), enforced, 945 F.2d 1428 (8th Cir. 1991); see, e.g., Int'l Van, 409 U.S. at 50, 53 (holding that a statement that striking employees "are being permanently replaced" constituted an unlawful discharge when permanent replacements had not been hired); W.C. McQuaide, Inc., 237 N.L.R.B. 177, 178-79 (1978) (holding that falsely informing strikers that they had been permanently replaced constituted an unlawful discharge), enforced, 617 F.2d 349 (3d Cir. 1980). Although the case law supporting the foregoing proposition involves false declarations made to economic strikers, the underlying principle is equally applicable to unfair labor practice strikers who have more, not fewer, rights and protections under the Act. See Pirelli Cable Corp. v. NLRB, 141 F.3d 503, 519 (4th Cir. 1998) (stating that "[u]nfair labor practice strikers have more rights and protections" than economic strikers); George Banta Co. v. NLRB, 686 F.2d 10, 20 (D.C. Cir. 1982) (noting that statutory reinstatement rights of economic and unfair labor practice strikers are "identical" except that the employer may not hire permanent replacements during an unfair labor practice strike).

Here, substantial evidence supports the Board's finding that, by falsely informing the striking employees that they had been permanently replaced, Citizens Publishing violated SS 8(a)(3) and 8(a)(1) of the Act. Citizens Publishing concedes in its brief that, on March 14, 1996, it gave the Union a letter indicating that, on March 13, it considered the replacement workers to be permanent hires. Citizens Publishing further concedes in its brief that it did not advise the replacements that they had become permanent employees until one day after giving the March 13 letter to the Union. Thus, Citizens Publishing and the replacement workers plainly lacked a mutual understanding regarding the replacement workers' status at the time Citizens Publishing presented the letter to the Union. These facts support the Board's finding that Citizens Publishing falsely advised the Union that it had permanently replaced the strikers. Accordingly, substantial evidence supports the determination that Citizens Publishing violated the Act by effectively discharging the striking employees through a

17

false declaration and withholding from them the right to return to their unoccupied jobs.

Moreover, by informing the Union in the March 13 letter that it considered the strikers to be economic strikers who were being permanently replaced, Citizens Publishing pre-empted the strikers' ability to make an unconditional offer to return to work. Thus, even if the strike was an economic strike, substantial evidence supports the determination that Citizens Publishing's representation violated the Act by enabling it to pre-empt the Union's unconditional offer to return to work, thereby affording Citizens Publishing the opportunity to hire actual permanent replacements.

Consequently, Citizens Publishing's reliance in its brief on the seemingly small amount of time (one day) it took to notify the replacements of their status after notifying the strikers is misplaced because the key fact under federal labor law is the effect of the misrepresentation. In addition, Citizens Publishing's contention that the misrepresentation did not violate the Act because it was made to the employees' union representatives, rather than directly to the strikers, is factually inaccurate because, as Citizens Publishing concedes in its brief, it delivered the message directly to two striking employees who were part of the Union's bargaining team.

Finally, Citizens Publishing contends that substantial evidence does not support the Board's decision here because it truthfully and accurately reflected its view of the replacement workers' status in the March 13 letter. However, this assertion ignores the fact that the letter stated that the changed status occurred "[e]ffective today," or March 13, even though the replacements were not actually informed until March 15. As a result, the Board reasonably interpreted the letter as falsely informing the Union that the strikers were permanently replaced as of March 13. But cf. Noel Foods, a Div. of Noel Corp. v. NLRB, 82 F.3d 1113, 1119-20 (D.C. Cir. 1996) (concluding that the employer's statement to the striking employees that it had hired permanent replacements was truthful when made). Further, the Board reasonably inferred that Citizens Publishing's intent in writing and delivering the letter on March 14 was reflected in the letter's message, namely,

that, because the strikers were being permanently replaced, it would be futile for the Union to make an unconditional offer to return to work.

Therefore, substantial evidence supports the Board's decision that Citizens Publishing falsely advised the Union that the strikers had been permanently replaced and failed to reinstate the strikers immediately upon their unconditional offer to return to work.

III.

For the foregoing reasons, we will deny the petition and grant the cross-application. Accordingly, because neither party challenges the propriety or scope of the relief ordered by the Board, we will enforce the Board's order in its entirety.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit