PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 22-2774 and 22-2868
_____

PG PUBLISHING CO., INC., DBA Pittsburgh Post-Gazette,
Petitioner in 22-2774

v.

NATIONAL LABOR RELATIONS BOARD,
Petitioner in 22-2868
_____

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations
Board
(NLRB Case No. 06-CA-233676)
_____

Argued
June 29, 2023

Before: JORDAN, KRAUSE and SMITH, *Circuit Judges*

(Filed: September 26, 2023)
_____

Alex R. Beining
Taylor Brailey
Brian M. Hentosz   [ARGUED]
Littler Mendelson
625 Liberty Avenue
EQT Plaza, 26th Fl.
Pittsburgh, PA   15222

Richard C. Lowe
Michael D. Oesterle
King & Ballow
315 Union Street
1100 Union Street Plaza
Nashville, TN  37201
    *Counsel for PG Publishing Co., Inc.,*
    *DBA Pittsburgh Post Gazette*

Ruth E. Burdick
Elizabeth A. Heaney
Joel Heller   [ARGUED]
National Labor Relations Board
1015 Half Street SE
Washington, DC   20570
    *Counsel for National Labor Relations Board*

Patrick K. Lemon
Joseph J. Pass
Justin T. Romano
Jubelirer Pass & Intrieri
219 Fort Pitt Boulevard – 1st Fl.
Pittsburgh, PA   15222

Maneesh Sharma   [ARGUED]
AFL-CIO
815 16th Street NW, 6th Fl.
Washington, DC   20006
    *Counsel for Graphic Communications*
    *International Union and GCC International*
    *Brotherhood of Teamsters Local 24M 9N*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

"Never pick a fight with anyone who buys ink by the barrel and paper by the ton."[1]  That advice recalls a time when newspapers were, as the name suggests, always printed on paper.  Things are different now.  This case arises in the aftermath of a decision by PG Publishing Co., Inc. (the "Post-Gazette" or the "Newspaper") to forsake the printed page and begin the move to an all-digital format.  That decision led to the termination of two paperhandlers represented by Local 24M/9N of the Graphic Communications International Union (the "Union").  The layoffs took place during negotiations

_____

[1] The quotation is of uncertain origin and apocryphally attributed to the likes of Benjamin Franklin, Mark Twain, and H.L. Mencken.  *See I Never Argue with a Man Who Buys Ink by the Barrel*, QuoteInvestigator (Apr. 24, 2018) https://quoteinvestigator.com/2018/04/24/ink/https://quoteinvestigator.com/2018/04/24/ink/ (tracing competing claims of authorship).

between the Union and the Post-Gazette for a successor to their collective bargaining agreement ("CBA"), which, by its terms, had ended on March 31, 2017. The paperhandlers were among twenty-four Post-Gazette employees covered by a provision of the expired CBA that had guaranteed those employees five shifts per week "for the balance of the Agreement, ending March 31, 2017[.]" (J.A. at 217.)

The Union filed a charge of unfair labor practices with the National Labor Relations Board, and the Board's General Counsel unsuccessfully pursued the matter before an Administrative Law Judge. A divided Board reversed the ALJ, finding an unfair labor practice. The matter is now before us, with the General Counsel seeking to enforce the Board's decision, and the Post-Gazette petitioning to have it overturned.[2] The parties' arguments implicate two principles identified in the Supreme Court's decisions under the National Labor Relations Act ("NLRA"). The first, exemplified by *Litton Financial Printing Division v. N.L.R.B.*, is that an employer commits an unfair labor practice under the NLRA if, after the expiration of a CBA, the employer alters the post-expiration status quo during negotiations for a successor CBA without first negotiating with its employees to an overall impasse on that successor CBA. 501 U.S. 190, 206-07 (1991). The second is that, under *First National Maintenance Corp. v. N.L.R.B.*, employers are privileged to make non-bargainable entrepreneurial decisions about the scope and direction of their

---

[2] We will refer to the body whose decisions we are reviewing as the Board (e.g., "the Board held ….") and the party appearing before us on the Board's behalf as the General Counsel (e.g., "the General Counsel argues ….").

4

business and, with respect to such a decision, the employer need not bargain with the union about whether to make the decision; it need only bargain about the "effects" of the decision once made. 452 U.S. 666, 681-82, 684 (1981).

The Board majority held that the five-shift guarantee in the expired CBA had become part of the status quo, and the layoffs, therefore, violated the guarantee and constituted an unfair labor practice because the Post-Gazette had not bargained to impasse with the Union on a new CBA. The majority reached that holding even though it acknowledged that the Newspaper's decision to go to an all-digital format is, indeed, a non-bargainable "core entrepreneurial decision." (J.A. at 32 n.18.) The Board dissent, by contrast, concluded that the five-shift guarantee was not part of the status quo and that, instead, *First National Maintenance* dictated the required scope of bargaining – namely bargaining about the *effects* of the all-digital decision – before the Post-Gazette could implement its proposed layoffs.

The dissent had it right. The proper mode of analysis requires application of ordinary contract principles to the expired CBA to determine whether the parties intended the five-shift guarantee to end with the expiration of the CBA. Applying those principles, we hold that the five-shift guarantee did not become part of the post-expiration status quo, as that provision makes plain the guarantee was to end when the CBA expired. But that does not bring this matter to a close because, under its own theory of the case, the Post-Gazette was still precluded from implementing the layoffs unless it engaged in adequate effects bargaining. We will therefore remand for the Board to determine whether the Post-Gazette did so.

5

## I. BACKGROUND

### A. Legal Principles

The complicated procedural background of this case may be more understandable with the aid of some background on the law governing labor negotiations, which we provide before turning to the facts.

### 1. Post-Expiration Status Quo

The Supreme Court has explained that "[a] fundamental aim of the [NLRA] is the establishment and maintenance of industrial peace to preserve the flow of interstate commerce." *First Nat'l Maint.*, 452 U.S. at 674. To that end, the NLRA grants "[e]mployees … the right … to bargain collectively through representatives of their own choosing[.]" 29 U.S.C. § 157. Section 8(a)(1) of the NLRA makes it an "unfair labor practice for an employer … to interfere with … the exercise of" that right. 29 U.S.C. § 158(a)(1). Further, Section 8(a)(5), with limited exceptions, makes it "an unfair labor practice for an employer … to refuse to bargain collectively with the representatives of his employees[.]" 29 U.S.C. § 158(a)(5). That same subsection, "as augmented by § 8(d), requires an employer to bargain over 'wages, hours, and other terms and conditions of employment.'" *Citizens Publ'g & Printing Co. v. N.L.R.B.*, 263 F.3d 224, 233 (3d Cir. 2001) (quoting 29 U.S.C. § 158(d)).

The parties do not dispute that, in general, an employer commits an unfair labor practice, violative of Sections 8(a)(1) and 8(a)(5) of the NLRA, when, after the expiration of a CBA and during negotiations for a successor CBA, the employer

6

alters the post-expiration status quo regarding the terms and conditions of employment without first negotiating with its employees to an overall impasse on the successor CBA. That proposition flows from the Supreme Court's decision in *N.L.R.B. v. Katz*, which held "that an employer's unilateral change in conditions of employment under negotiation is similarly a violation of [Section 8(a)(5) of the NRLA, 29 U.S.C. § 158(a)(5)], for it is a circumvention of the duty to negotiate which frustrates the objectives of [Section 8(a)(5)] much as does a flat refusal."[3]  369 U.S. 736, 743 (1962); *see also Bottom Line Enters.*, 302 NLRB 373, 374 (1991) (citing *Katz*, 369 U.S. 736) ("[W]hen, as here, the parties are engaged in negotiations, an employer's obligation to refrain from unilateral changes extends beyond the mere duty to give notice and an opportunity to bargain; it encompasses a duty to refrain from implementation at all, unless and until an overall impasse has been reached on bargaining for the agreement as a whole.").

---

[3] As a technical matter, we have explained that such a unilateral change violates Section 8(a)(5) directly, while Section 8(a)(1) is violated derivatively because "[b]y unilaterally changing the employees' terms and conditions of employment, an employer 'minimizes the influence of organized bargaining' and 'emphasiz[es] to the employees that there is no necessity for a collective bargaining agent.'" *Citizens Publ'g*, 263 F.3d at 233 (quoting *May Dep't Stores Co. v. N.L.R.B.*, 326 U.S. 376, 385 (1945)).  Because that distinction makes no difference to the question before us, we do not give it further attention.

The Supreme Court in *Litton* made clear that, although an expired CBA may "by its own terms release[] all its parties from their respective contractual obligations," the expired CBA remains of central importance to the status quo inquiry. 501 U.S. at 206. That is, the terms of the expired CBA "'retain legal significance because they define the *status quo*' for purposes of the prohibition on unilateral changes." *Id*. (quoting *Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 26 (2d Cir. 1988). Thus, whether a particular term survives a CBA's expiration depends on the contracting parties' intent as embodied in the CBA.

## 2. Right to Make Entrepreneurial Decisions

More than forty years ago, in *First National Maintenance*, the Supreme Court considered whether "an employer, under its duty to bargain in good faith 'with respect to wages, hours, and other terms and conditions of employment,' … [must] negotiate with the certified representative of its employees over its decision to close a part of its business?" 452 U.S. at 667 (quoting 29 U.S.C. §§ 158(d) and 158(a)(5)). The Court answered no. *Id*. at 686.

In doing so, it noted that the NLRA does not require employers to bargain over entrepreneurial decisions. The Court explained that, while employers and employees are "free to bargain about any legal subject," the congressionally mandated *duty* to bargain is "limited … to matters of 'wages, hours, and other terms and conditions of employment.'" *Id*. at 674-75. These are mandatory subjects of bargaining. And an employer's unilateral change to such matters "violates the statutory duty to bargain and is subject to the Board's remedial order." *Id*. at 674-75 (citing *Katz*, 369 U.S. 736).

8

Nevertheless, the Court made it plain that, "in establishing what issues must be submitted to the process of bargaining, Congress had no expectation that the elected union representative would become an equal partner in the running of the business enterprise in which the union's members are employed." *Id*. at 676. Instead, "the union must be given a significant opportunity to bargain about [the related] matters of job security as part of the 'effects' bargaining mandated by § 8(a)(5)." *Id*. at 681. In that way, the union can still play a salutary role once the entrepreneurial decision is made. *Id*. at 682.

## B.    Factual Background[4]

The Post-Gazette publishes a daily newspaper and the Union has represented the Newspaper's pressmen and paperhandlers for many years, including all times relevant to the petitions before us. The Post-Gazette's now-expired CBA with the Union became effective November 16, 2014. That CBA contained a clause providing that the whole agreement would terminate on March 31, 2017.[5] During the duration of

---

[4] The Post-Gazette and General Counsel agreed to proceed before the ALJ on a stipulated record, including exhibits. Except for the extent of effects bargaining, this case does not turn on any dispute of material fact.

[5] The cover page of the expired CBA states: "Effective: November 16, 2014" and "Expires: March 31, 2017." (J.A. at 209.) On the first page of the body of the expired CBA, in Section 1.2, it provides: "This Agreement shall continue in force from its effective date until and including the shift

the CBA, the Newspaper published a print edition seven days a week.

Section 10.2 of the expired CBA provides a five-shift guarantee and states in pertinent part:

> Effective the first payroll week following the signing of the collective bargaining agreement, all employees listed by name at the time of the signing of this Agreement shall be guaranteed a five (5) shift mark-up each payroll week for the balance of the Agreement, ending March 31, 2017, except under the following circumstances ….

(J.A. at 217.)[6]

The Post-Gazette and the Union began negotiating for a successor CBA in March 2017, but they have not yet entered

starting March 31, 2017[,] and from year to year thereafter," unless written notice is given by either party "of its intention to open negotiations for a new agreement[.]" (J.A. at 212.) No one has argued that the requisite notice was not given.

[6] The exceptions in Section 10.2 do not deal with extending the duration of the provision. Rather, they deal with exceptions to the five-shift guarantee that were available while that provision was in effect. No one argues that those exceptions are implicated here, as the Post-Gazette has not attempted to justify firing Murrio or Jenkins in accordance with an exception that would have obtained if the five-shift guarantee had remained binding on it.

into such an agreement. In June 2018, fifteen months after the expiration of the CBA, the Post-Gazette informed the Union that the newspaper would undergo a transition to an all-digital format, beginning in August 2018 with a reduction from a daily print edition to only five print editions each week, and that there would be consequent layoffs, starting with the paperhandlers. It is undisputed that the Post-Gazette engaged in some bargaining over the effects flowing from the decision to go all-digital, including the layoffs.

In August 2018, according to plan, the Newspaper eliminated its Tuesday and Saturday print editions. Although the Post-Gazette and the Union had not bargained to an overall impasse on the content of a successor CBA, Messrs. Murrio and Jenkins were laid off roughly six weeks later, in October 2018.

## C.     Procedural Background

### 1.     Proceedings Before the ALJ

After those layoffs, the Union filed a charge of unfair labor practices with the Board.[7] The Board's General Counsel then issued an administrative complaint in March 2020, noticing a hearing for June 2020. The Post-Gazette filed an answer, including several affirmative defenses. At the parties' joint request, the ALJ accepted factual stipulations and briefing without holding a hearing.

---

[7] The Union filed the unfair labor practice charge on January 7, 2019, filing an amended charge on February 14, 2019. References herein are to the amended charge.

11

In his briefing to the ALJ, the General Counsel argued that the Post-Gazette violated the NLRA in two ways.[8] The first was "by eliminating the five shift per week guarantee and laying off two paperhandlers because it was engaged in successor contract negotiations at the time and … could not unilaterally implement layoffs, a mandatory subject of bargaining, absent overall impasse." (J.A. at 369.) The second was by laying off Murrio and Jenkins, which, according to the General Counsel, "constituted a violation of [the Post-Gazette's] statutory duty to maintain the status quo, which arguably included the minimum-shift guarantee." (J.A. at 369 (citing *Finley Hosp.*, 362 NLRB 915 (2015).) The General Counsel also asked the Board to overrule the decision he was relying on for that point, *Finley Hospital*.[9] (J.A. at 369, 377-80.)

---

[8] Part of the administrative complaint dealt with certain information requests from the Union to the Post-Gazette. The ALJ upheld the Post-Gazette's disposition of those requests, and the Board affirmed the ALJ on that point. No one has challenged that aspect of the Board's decision, so there is no need to discuss it further.

[9] In relevant part, the Board's *Finley Hospital* decision stands for two propositions. The first is that most terms in an expired CBA – at least those touching on a point of mandatory bargaining (i.e., wages, hours, and other terms and conditions of employment) – continue during the pendency of negotiations of a successor CBA by operation of the NLRA. 362 NLRB 915, 916-18 (2015). The second is that, with respect to such a term, it is not enough that an expired CBA provides that the term is no longer operative as a contractual matter. *Id*. at 917-18. Instead, the CBA must contain "clear

For its part, the Post-Gazette advanced two lines of argument before the ALJ that are pertinent here. Invoking *First National Maintenance*, the Post-Gazette declared that it had made a non-bargainable entrepreneurial decision to move to an all-digital format, so it needed only to engage in adequate, good faith "effects" bargaining regarding the layoffs, and had done so. Its second argument was that the five-shift guarantee, according to its terms, did not survive the expiration of the CBA and so did not become part of the post-expiration status quo. In a footnote to that latter argument, the Newspaper "agree[d] with the General Counsel's position that *Finley Hospital* was wrongly decided and should be overturned[.]" (J.A. at 329 n.2.)

## 2.  The ALJ's Decision

The ALJ dismissed the General Counsel's administrative complaint. In so doing, he noted that parties negotiating a successor collective bargaining agreement are generally required to bargain until they reach an overall impasse before either may unilaterally change the status quo; that the five-shift guarantee was part of the status quo; and that the parties had not reached an overall impasse on a new CBA. He also thought it obvious that, "as a general matter, layoffs proposed during contract negotiations are subject to the … overall-impasse rule."[10] (J.A. at 19.) The ALJ thus reasoned,

─────────────

and unmistakable" language sufficient to waive a statutory right to prevent the continuation of that term post-expiration. *Id.* at 916.

[10] As he explained, under Board precedent, "it is long-settled that the decision to lay off unit employees is a mandatory subject of bargaining." (J.A. at 18 (citing, among

13

"[e]ven granting, arguendo, the [Post-Gazette]'s premise that the section 10.2 [five-shift] guarantee did not continue as part of the postexpiration status quo, this would not give the [Post-Gazette] the right to impose layoffs without bargaining during collective-bargaining negotiations for a new agreement." (J.A. at 18 n.7.)

And yet the ALJ recognized the "difficult issue" that, "while the [Post-Gazette]'s layoff proposals arose during contract negotiations, they arose as a result and effect of the [Post-Gazette's] decision to become a digital news organization and reduce print operations." (J.A. at 19.) Although there was no Board precedent directly on point, the ALJ concluded that "application of the … overall-impasse rule to bargaining over layoffs that are the effect of a non-bargainable decision is inconsistent with the Board's approach to effects bargaining."[11] (J.A. at 20.) Thus, the ALJ rejected the argument that the layoffs constituted an unfair labor practice and dismissed it accordingly. He also concluded that

---

other things, *Tri-Tech Servs.*, 340 NLRB 894, 895 (2003) ("It is well established that the layoff of unit employees is a change in terms and conditions of employment over which an employer must bargain."))).

[11] In *Bottom Line Enterprises*, the Board laid out the overall impasse rule, saying, "[w]hen … the parties are engaged in negotiations, an employer's obligation to refrain from unilateral changes extends beyond the mere duty to give notice and an opportunity to bargain; it encompasses a duty to refrain from implementation at all, unless and until an overall impasse has been reached on bargaining for the agreement as a whole." 302 NLRB at 374 (citing *Katz*, 369 U.S. 736).

14

the General Counsel had forfeited the separate but related theory of liability that the elimination of the five-shift guarantee was itself an improper departure from the status quo. In essence, the ALJ ruled that only one theory of liability had been properly advanced, a theory based on the layoffs.

### 3. Proceedings Before the Board

The General Counsel filed exceptions to the ALJ's decision, and, despite prevailing before the ALJ, the Post-Gazette filed cross-exceptions.[12] The General Counsel's exceptions continued to advance his earlier positions, contending that the Post-Gazette engaged in unfair labor practices in two ways. First, he argued that the layoffs "violated Section 8(a)(5) of the Act because [the Post-Gazette] was engaged in successor contract negotiations at the time and … could not lawfully unilaterally implement layoffs and thereby eliminate the minimum shift guarantee, mandatory subjects of bargaining, absent overall impasse." (General Counsel's Br. in Support of Exceptions at 3.) And, second, "under *Finley Hospital*, the layoffs constituted a violation of its statutory duty to maintain the status quo, which included a guarantee that workers would receive minimum number of shifts per week." (*Id.*) The General Counsel continued to maintain that *Finley Hospital* ought to be overruled.[13] (*Id.* at

---

[12] We note that the General Counsel's brief in support of his exceptions was inadvertently omitted from the Joint Appendix. But it is publicly available on the Board's docket under Case 06-CA-233676. https://www.nlrb.gov/case/06-CA-233676 (last visited on Aug. 23, 2023).

[13] During the pendency of the matter before the Board, General Counsel Peter Robb (an appointee of former President

15

7.)   He argued that "the ALJ wrongfully found that the unilateral elimination of the shift guarantee was not an independent violation of the Act[.]"  (*Id.* at 6.)

The General Counsel made plain his disagreement with the notion that only one theory of liability was before the ALJ and that the overall-impasse rule did not apply.  The "layoffs constituted a unilateral change in terms and conditions of employment[,]" the General Counsel said, "[e]ven granting, arguendo, [the Post-Gazette's] premise that the section 10.2 guarantee did not continue as part of the postexpiration status quo[.]" (*Id.* at 11 (quoting the ALJ's decision).)   He also argued "that the ALJ erred in finding that the … overall-impasse rule is not applicable here … ."[14] (*Id.* at 10.)

Donald Trump) was removed from office.  Acting General Counsel Peter Sung Ohr sought to file a supplemental brief to withdraw that recommendation, a request the Post-Gazette opposed.  The request was denied.  This apparent change of views is not the focus of the briefing before us.  Thus, it is not further discussed herein and does not play a role in our decision.

[14] The General Counsel also questioned the legal basis for the ALJ's conclusion that the overall-impasse rule does not apply when an employer makes layoffs based on an entrepreneurial decision.  For example, the General Counsel said that "[t]he ALJ failed to recognize that this area of law is unclear, and the Board should clarify what an employer's obligations are in this situation accordingly."  (General Counsel's Br. in Support of Exceptions at 10.)  He did not dispute that the "decision to move towards a digital news organization and reduce print operations by two-days a week

The Post-Gazette advanced fourteen cross-exceptions, reiterating its positions that *Finley Hospital* should be overruled, that the five-shift guarantee had expired, and that *First National Maintenance* controls the outcome of this case. Additionally, the Post-Gazette urged that the ALJ had erred by failing to conclude that, after it had "provided notice and offer[ed] to discuss the effects of its non-bargainable decision [to go digital], [the Post-Gazette] bargained to a lawful impasse before lawfully implementing its layoff effects proposal." (J.A. at 395.)

### 4. The Board Majority's Decision

The full Board, divided three to two, reversed the ALJ's dismissal and concluded that the Newspaper had, indeed, engaged in an unfair labor practice. The Board majority rejected the ALJ's decision in three ways pertinent to this appeal. First, it concluded that, "contrary to the [ALJ's determination,] the General Counsel's brief to the [ALJ] confirmed that the General Counsel had raised two theories of liability under Section 8(a)(5) of the Act, one of which was that the layoffs were unlawful because they constituted a violation of the [Post-Gazette]'s statutory duty to maintain the status quo, which included a guarantee that workers would receive a

---

is a nonbargainable entrepreneurial decision under *First Maintenance*." (*Id.* at 12.) Rather he argued that, if "the Board finds that [the Post-Gazette] was not bound to the … overall-impasse rule in these circumstances, the parties did not bargain to impasse over the effects of [the Post-Gazette]'s decision, nor did the Union clearly and unmistakably waive its right through bargaining." (*Id.* at 14.)

17

minimum number of shifts per week." (J.A. at 29.) In other words, the Board majority determined that there were two theories of liability – one premised on the layoffs, the other premised on the elimination of the five-shift guarantee – and that neither had been forfeited.

Second, the Board majority expressly reaffirmed its *Finley Hospital* precedent and then, under that authority, condemned the elimination of the five-shift guarantee. According to the majority:

> The five-shift guarantee is a mandatory subject of bargaining; it was an established term of employment under the parties' collective-bargaining agreement …. It is therefore clear that the [Post-Gazette] was barred from unilaterally terminating the five-shift guarantee at the expiration of the collective-bargaining agreement (and thereby laying off employees covered by the five-shift guarantee), absent either an impasse in bargaining with the Union or a waiver by the Union of the right to demand compliance with the guarantee on behalf of bargaining unit employees. Here, the parties stipulated that they were not at an overall impasse. And, … the parties' collective-bargaining agreement contains no language clearly and unmistakably waiving the Union's statutory right to maintenance of the five-shift guarantee (unless and until the parties reached an impasse in bargaining or a new collective-bargaining agreement). Accordingly, the [Post-Gazette] violated the [National Labor Relations]

Act by unilaterally failing to abide by the [five]-shift guarantee with respect to the two employees[, Murrio and Jenkins].

(J.A. at 32 (footnotes omitted).)

Third, having concluded that the termination of Murrio and Jenkins constituted an unfair labor practice, the Board majority declined to discuss whether the overall-impasse rule ought to be applied to bargaining over the effects of a non-bargainable decision. The Board majority nevertheless acknowledged that the Post-Gazette's decision to "transition to an all-digital format and eliminate 2 days of print publication per week was a core entrepreneurial decision over which the [Newspaper] had no duty to bargain." (J.A. at 32 n.18.) But, the majority said, "[t]his entrepreneurial decision … did not alter the terms of its preexisting collective-bargaining agreement with the Union or the resulting postexpiration status quo that it had a statutory obligation to maintain, including the five-shift guarantee, independent of any effects-bargaining obligation." (*Id*.)

### 5. Board Dissent

Two members of the Board joined in a vigorous dissent. They would have held that the five-shift guarantee did not survive the expiration of the CBA, that the Board's *Finley Hospital* precedent was no longer good law, and that the Supreme Court's opinion in *First National Maintenance* dictated a decision in favor of the Post-Gazette.

On the first point, the dissenting Board members said that a contractual obligation ends when a CBA expires and

19

only becomes part of the post-expiration status quo when the expired CBA expressly provides by its terms that it survives. In support of this position, which might be called their "express condition" argument, the dissenting members quoted the Supreme Court's decision in *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015), and said, "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." (J.A. at 43 (quoting *Tackett*, 574 U.S. at 441-42, which in turn quotes *Litton*, 501 U.S. at 207).) The dissenters observed, however, that it was unnecessary to go that far to resolve the case. In their view, it was evident that, based on the text of the CBA, the five-shift guarantee was not intended to form part of the post-expiration status quo. They described the text of Section 10.2 as "doubly reinforc[ing] the durational limitation of the five-shift guarantee: not only did the guarantee apply only 'for the balance of the Agreement,' but section 10.2 also set a specific end date for the five-shift guarantee, 'March 31, 2017.'" (J.A. at 43.) Accordingly, the "durational language is properly interpreted to terminate the five-shift guarantee for statutory purposes[.]" (J.A. at 43.)

As to the second point, the dissent framed the question as "whether an employer engaged in negotiations for a successor collective-bargaining agreement must refrain from implementing layoffs necessitated by a non-bargainable decision in the absence of an overall impasse in negotiations." (J.A. at 47.) The dissent concluded that the ALJ had correctly answered that question with a "no."

But the dissent went on to say that the result the ALJ reached was compelled by *First National Maintenance*, 452 U.S. 666, rather than being merely derived implicitly from the

20

Board's precedent on effects bargaining, as the ALJ had concluded.[15]  According to the dissent, "subjecting effects bargaining to the overall-impasse rule" would permit a union to thwart management's ability to implement a non-bargainable decision if it has the "opportunity for delay[] over issues entirely unrelated to the managerial decision in question."  (J.A. at 47.)

### 6.  Cross-Petitions

The case has arrived in our Court via the Post-Gazette's petition for review of the Board's decision and the General Counsel's petition for enforcement of the same.  The Union has filed a brief as intervenor.

## II.  DISCUSSION[16]

### A.  The Five-Shift Guarantee

The Post-Gazette's arguments largely track those advanced by the Board dissent.  Although it endorses the Board

---

[15] The Supreme Court analogized the "decision[] involving a change in the scope and direction of the enterprise," to "the decision whether to be in business at all[.]" 452 U.S. at 677.  Such a decision is non-bargainable and only requires the employer to bargain "over the effects of [the] decision . . . in a meaningful manner and at a meaningful time[.]" *Id*. at 681-82.

[16] The Board had jurisdiction pursuant to 29 U.S.C. § 160(a), (c) to prevent unfair labor practices under 29 U.S.C. § 158(a)(1), (5).  We have jurisdiction to consider a petition for enforcement filed by the General Counsel under 29 U.S.C.

dissent's express condition argument concerning the status of expired CBAs,[17] the Newspaper does not put all its eggs in that basket. Citing the Supreme Court's decisions in *Tackett* and *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761 (2018), each of which stated that expired CBAs are generally interpreted according to ordinary contract principles, the Post-Gazette contends that it prevails under the more modest argument that, in light of Section 10.2's express statement that "the guarantee would be in effect 'for the balance of the Agreement, ending March 31, 2017,'" "there is only one way to interpret the five-shift guarantee – it ended with the Agreement on March 31, 2017[,]"

---

§ 160(e). And we have jurisdiction to consider the Post-Gazette's petition for review of the Board's order under 29 U.S.C. § 160(f). "An order of the Board is customarily entitled to enforcement if its findings are supported by substantial evidence and the order is consistent with the policies of the NLRA." *Int'l Bhd. of Elec. Workers, Loc. 803*, *AFL-CIO v. N.L.R.B.,* 826 F.2d 1283, 1287 (3d Cir. 1987). And the Board's interpretation of the NLRA will be "upheld unless it represents 'an unreasonable or an unprincipled construction of the statute[.]'" *Id*. (quoting *Ford Motor Co. v. N.L.R.B.*, 441 U.S. 488, 497 (1979)). But we owe the Board no deference on matters of contractual interpretation, even when undertaken in connection with unfair labor practice proceedings. *Litton*, 501 U.S. at 202-03.

[17] Again, as noted *supra* in Section I.C.5, the express condition argument contends that, in the absence of express contractual language providing that a term survives the expiration of the CBA, the term does not become part of the post-expiration status quo for statutory purposes under the NLRA.

and so never became part of the post-expiration status quo. (*See, e.g.*, Opening Br. at 9.)

The General Counsel responds with a defense of the Board's majority opinion. He says the Board was correct to apply a clear-and-unmistakable-waiver standard to determine whether the five-shift guarantee became part of the status quo and thus survived the CBA's expiration.[18] He also argues that nothing in *Tackett* and *Reese* overruled or modified *Litton*'s emphasis on the importance of an expired CBA in establishing the background status quo for bargaining over a new CBA, as those later decisions examined expired CBAs in the context of the Employee Retirement Income Security Act of 1974 ("ERISA"), not in an NLRA case. Thus, the General Counsel argues, under the waiver standard, the Board correctly determined that the five-shift guarantee was part of the post-expiration status quo. The Union's arguments are effectively identical to those advanced by the General Counsel on the five-shift guarantee issue, so we do not set them out separately.

The dispute over the five-shift guarantee thus boils down to this: whether ordinary contract principles or the heightened standard applicable to the waiver of a statutory right, i.e., the clear-and-unmistakable-waiver standard, should apply in determining whether a provision in an expired CBA becomes part of the post-expiration status quo for purposes of future labor negotiations. We believe the answer to that question inheres in the Supreme Court's observation in *Litton*

---

[18] The General Counsel also contends that the Post-Gazette has abandoned any argument that the clear-and-unmistakable-waiver standard was satisfied.

that the terms of an expired CBA "retain legal significance because they *define the status quo*." *Litton*, 501 U.S. at 206 (emphasis added) (quoting *Derrico,* 844 F.2d at 26, in a parenthetical, while citing *Derrico* more broadly, 844 F.2d at 25-27). We are thus directed to the language of the CBA in question, and to the ordinary principles of contract interpretation, to determine whether a particular term forms part of the status quo. If the language of the CBA does not indicate that the term in question persists as part of the status quo, the inquiry ends. If, but only if, the contract indicates in some fashion that the term does form part of the post-expiration status quo – and therefore continues to govern the parties by operation of the NLRA – then the employer must meet the clear-and-unmistakable-waiver standard if it wishes to assert that its employees have waived their statutory right to the benefits of the contested term.

The Board majority misapprehended the lesson of *Litton*. That lesson is best understood by first considering the Second Circuit's decision in *Derrico*, which provided a cogent explanation of "the post-expiration effect of a CBA[,]" and which *Litton* cited with approval.[19] The Second Circuit said it

[19] In *Derrico*, the plaintiff was a registered nurse who was fired after the expiration of a collective bargaining agreement between his former employer, a hospital, and his former union, while that employer negotiated a successor agreement with a new union. 844 F.2d at 23. After the Acting Regional Counsel for the Board declined to issue a complaint under the NLRA as to either of the two charges, the nurse sued for breach of contract in New York state court. *Id*. at 24. As relevant here, after the case was removed to district court, the court construed that claim to proceed on the theory that "the

24

was a mistake to believe "that federal law preserves the expired CBA 'in full force and effect' pending an impasse in bargaining." *Derrico*, 844 F.2d at 26. Rather, there was an overarching principle "that the parties must maintain the *status quo* until they have negotiated to impasse, and an employer's unilateral change of terms and conditions of employment during this process constitutes" an unfair labor practice. *Id*. (citing *Katz*, 369 U.S. at 743). And further, there was "[a] corollary to this principle[, namely,] that after expiration of a CBA and before impasse in bargaining, it is an unfair labor practice for an employer unilaterally to alter the *status quo* defined by the expired contract." *Id*. Consequently, the Second Circuit said, in language later quoted in *Litton*, "[t]he terms of an expired agreement … retain legal significance because they define the *status quo*." *Id*. But, of particular importance here, the *Derrico* court went on to observe that "[r]ights and duties under a collective bargaining agreement do not otherwise survive the contract's termination at an agreed expiration date." *Id*. at 26-27.

---

for-cause limitation in the expired CBA" became part of a separately enforceable implied contract under New York law between the plaintiff and his employer. *Id*. The district court then dismissed the case "on the ground that the complaint raised issues within the primary jurisdiction of the NLRB." *Id*. The Second Circuit affirmed that removal was proper and that the case was indeed preempted by federal law. *Id*. at 27-29. In so doing, the court found it necessary to summarize its "understanding of the post-expiration effect of a CBA." *Id*. at 26.

The implication here is that not everything in a CBA should be taken as constituting the status quo that must be honored during later negotiations. Rather, ordinary contract principles must be applied to analyze which provisions of an expired CBA define the status quo; those provisions then continue to have effect, while the rest of the CBA lapses at the agreed-upon expiration date. While the Supreme Court, in approving the approach laid out in *Derrico*, said that, "after expiration [of a CBA,] most terms and conditions of employment are not subject to unilateral change[,]" 501 U.S. at 206, it did not suggest that everything in a CBA defines the status quo.

The Board majority failed to follow the appropriate analytical path because it evidently read the word "most" in *Litton* to mean that *all* subjects of mandatory bargaining necessarily form the post-expiration status quo and so continue unless the clear-and-unmistakable-waiver standard attendant to statutory rights is met. The General Counsel and the Union advance that same view before us.

In their collective reasoning, use of the word "most" carves out only non-mandatory subjects of bargaining such as "arbitration provisions, no-strike clauses, and union-security agreements" from being part of the post-expiration status quo. (General Counsel Br. at 13 & n.4.) Or, in the words of the Board majority, the five-shift guarantee is not among such "categorical exceptions" to the prohibition on unilateral changes to the status quo, as laid out in the rule enunciated in *Katz*, 369 U.S. at 743, and reiterated in *Litton*. (J.A. at 32.)

But "most" does not mean "all." And simply because certain provisions in an expired CBA may address subjects

26

besides the mandatory-bargaining issues captured in the phrase "wages, hours, and other terms and conditions of employment," 369 U.S. at 742-43, that does not mean that all other provisions in an expired CBA are necessarily included in the post-expiration status quo. Nothing in Supreme Court jurisprudence says that any provision touching on subjects of mandatory bargaining is by law included in the post-expiration status quo without reference to the terms of the expired CBA.

In *Litton*, the questions were, first, whether a CBA provision dealing with arbitration of certain labor grievances survived the CBA's expiration and covered the period before a successor CBA was entered into, and second, if so, whether the survival of that provision was (i) a contractual matter pursuant to the terms of the expired CBA, (ii) a result of the statutory obligation not to unilaterally change the status quo, or (iii) both. 501 U.S. at 193, 198-99, 203-06. Properly understood, *Litton* was making the non-controversial point that just because it had concluded a provision at issue in another case – *Nolde Bros., Inc. v. Bakery Workers*, 430 U.S. 243 (1977) – and it had survived as a matter of contract law in the circumstances of that case, there was no reason to believe the same would be true in every case. As the *Litton* Court stated:

> We agree with the approach of the Board and those courts which have interpreted *Nolde Brothers* to apply only where a dispute has its real source in the contract. The object of an arbitration clause is to implement a contract, not to transcend it. *Nolde Brothers* does not announce a rule that post[-]expiration grievances concerning terms and conditions of employment remain arbitrable.

27

*Litton*, 501 U.S. at 205.

It was in connection with that last sentence that *Litton* uttered the words the Board majority used to dismiss *Tackett*, namely, that "no language in *Tackett* casts doubt on *Litton*'s teaching that most terms and conditions of employment continue, by operation of law, pending impasse or agreement over a successor contract." (J.A. at 35-36 n.30.) But, again, whether a term does survive requires analysis of the contractual language. *Litton* certainly does not suggest that a contract term providing for its own expiration at the end of the CBA should not be given effect.

### 1. *Finley Hospital*

The proper relationship between ordinary contract law principles and the question of the post-expiration status quo was aptly illustrated by the Eighth Circuit's refusal to enforce the Board's decision in *Finley Hospital*, 362 NLRB 915. In that case, the Eighth Circuit dealt with a Board majority's decision that Finley Hospital had violated the NLRA by "unilaterally discontinuing annual pay raises negotiated in a one-year collective bargaining agreement … without bargaining with" the union representing the hospital's nurses. *Finley Hosp. v. N.L.R.B.*, 827 F.3d 720, 722 (8th Cir. 2016). The court held that the Board majority had erred in determining "that the one-year-long CBA with the Union established a status quo of annual, compounded raises that, under the NLRA, must be continued after the agreement's expiration."[20] *Id.* at

---

[20] The analysis is instructive. The Eighth Circuit began its analysis with five straightforward points (some specific to

724. The court correctly identified a flaw in the Board majority's analysis: The Board did not bother to "discuss[] exactly how the language of [the CBA provision in question] established a status quo of annual pay raises[.]" *Id*. Instead, it "simply assumed that because the CBA authorized a one-time 3% pay raise, annual 3% raises automatically became part of the status quo that must be maintained during negotiations." *Id*. Thus, the court observed, in the words of the Board's dissenting member in that case, the majority ignored the "time constraint that was an inherent part of the wage increase obligation, … mak[ing] a time-bound obligation into a perpetual one." *Id*. at 725.

The Eighth Circuit noted there was no basis offered under the NLRA or contract law to support the Board's

that CBA): First, under "[t]he unilateral change doctrine … 'an employer's unilateral change in conditions of employment under negotiation is'" an "unfair labor practice." *Finley Hosp.*, 827 F.3d at 724 (quoting *Katz*, 369 U.S. at 743). Second, "[t]he terms and conditions that continue as part of the status quo under the unilateral change doctrine 'are no longer agreed-upon terms; they are terms imposed by law.'" *Id*. (quoting *Litton*, 501 U.S. at 206). Third, the parties agreed that, "because the CBA had expired, the Hospital no longer had any contractual obligations." *Id*. Fourth, that left "[t]he critical inquiry[, namely,] whether there existed an established practice or status quo that created a statutory obligation of compounded, annual raises." *Id*. (first alteration in original) (cleaned up). And, fifth, "[t]he Board relied solely on its interpretation of Article 20.3 of the CBA to conclude that continuing 3% pay increases were part of the status quo." *Id*.

29

decision. As for the NLRA, "[t]he purpose of the [Act] was surely not to make all wage terms in every employment agreement last beyond the tenure of the bargained-for agreement." *Id*. On the question of contract interpretation, the court reasoned that "the raise-providing provision[] states that it applies only 'for the duration of this Agreement[,]' [and t]hat phrase, or a slight variation of that phrase, is used three times in [that provision], and the parties knew that the CBA expired in one year." *Id*.

The Eighth Circuit concluded that the provision, by its "plain language," "does not, as the Board states, provide for periodic wage increases or annual raises; rather, the language sets forth a straight forward, singular pay increase on a particular day during the one-year contract." *Id*. And, further, it was not a situation where a status quo was created absent a contractual provision by operation of a "longstanding practice of giving such raises." *Id*. at 726. Consequently, because the Eighth Circuit held that the provision "did not establish a status quo of, and thus a statutory right to, annual 3% raises," that ended the matter without necessitating a consideration of whether "the [u]nion waived its alleged statutory right to post-expiration raises." *Id*. Accordingly, the court set aside the Board's decision on that point, affirming as to non-contested ancillary points. *Id*. at 726-27.

**2.    *Wilkes-Barre Hospital***

The decision of the D.C. Circuit in *Wilkes-Barre Hosp. Co., LLC v. N.L.R.B.*, 857 F.3d 364 (D.C. Cir. 2017), likewise models the proper analysis for determining whether a term in an expired CBA forms part of the post-expiration status quo. There, the employer, who operated a hospital in Wilkes-Barre,

30

Pennsylvania, sought review of the Board's decision that it had committed an unfair labor practice "by unilaterally ceasing the payment of longevity-based wage increases to its nurses after the expiration of the parties' collective bargaining agreement." *Id.* at 367. The hospital argued that "the language of the agreement and the parties' shared understanding of that language demonstrate that the Hospital was not obligated to continue paying longevity-based increases upon expiration of the agreement." *Id.* The D.C. Circuit denied the petition for review and enforced the Board's order. *Id.*

Helpfully for our purposes, after explaining that the "primary dispute in this case concerns the proper determination of the post-expiration status quo[,]" the D.C. Circuit examined the expired CBA and determined, through the contract's "language and structure, [that it] establishe[d] two distinct types of wage increases: across-the-board raises and longevity-based increases."[21] *Id.* at 374-75. The court concluded that the "terms of the … CBA establish that the payment of longevity-based increases represents the post-expiration status quo," but that was not the case for the across-the-board raises. *Id.* at 376. According to the court, "[t]he longevity-based increases,

---

[21] The D.C. Circuit did so after observing that, "[i]n defining the post-expiration status quo in this case, therefore, we look to the substantive terms of the 2011 CBA." *Wilkes-Barre Hosp.*, 857 F.3d at 374. Though it does not cite *Litton* for that proposition, lines earlier it relied on the pertinent portion of *Litton*, stating "certain terms of an expired agreement extend beyond the agreement's expiration and continue to 'define the status quo[.]'" *Id.* (quoting *Litton*, 501 U.S. at 206).

unlike the across-the-board raises, were tied to an individual nurse's anniversary date, not to the term of the agreement." *Id.* at 375. "Specifically, the agreement state[d] that longevity-based increases were to be paid on 'January 27th of the year following the employee's anniversary date.'" *Id.* Only after that nuanced examination of the durational language associated with the two types of pay increases did the D.C. Circuit consider whether the durational language associated with the longevity increases was sufficient to constitute a waiver. *Id.*

*Wilkes-Barre Hospital* therefore supports the proposition that we are to apply ordinary contract principles to assess, in the first instance, whether a term in an expired CBA constitutes part of the post-expiration status quo. And, further, we read *Wilkes-Barre Hospital* as teaching that dates supplied in a challenged provision are properly considered, before any consideration of waiver, to determine whether the parties intended that provision to end with the expiration of the CBA.

Notably, neither *Finley Hospital* nor *Wilkes-Barre Hospital* suggests that the Supreme Court's decision in *Tackett* represented a sea change. Instead, each cites *Tackett* for the modest proposition that "[w]e interpret collective-bargaining agreements … according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *Finley Hosp.*, 827 F.3d at 725 (quoting *Tackett*, 574 U.S. at 435); *see also Wilkes-Barre Hosp.*, 857 F.3d at 373 ("When interpreting a collective bargaining agreement, we generally apply 'ordinary principles of contract law.'") (quoting *Tackett*, 574 U.S. at 435). Furthermore, there is no indication that either court viewed *Tackett* – which, as previously noted, examined an expired CBA in the context of ERISA – as overruling or modifying *Litton* on the proper

32

understanding of the NLRA. And *Tackett* makes no suggestion that it does. The same is true of *Reese*.[22]

Consequently, we do not endorse the more sweeping proposition advocated by the Board dissent that the terms in an expired CBA form a part of the post-expiration status quo only when there is some explicit statement by the parties. We see no support for that proposition in *Tackett* or *Reese*.

### 3. Application

With all that in mind, we apply ordinary contract law principles to ascertain whether the five-shift guarantee became part of the post-expiration status quo. As the Supreme Court has explained, the task of contract interpretation does not materially differ when that contract is an expired CBA. That is, "[i]n this endeavor, as with any other contract, the parties' intentions control." *Tackett*, 574 U.S. at 435 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)). Thus, "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id*. (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012)).

We hold that Section 10.2 unambiguously provides that the five-shift guarantee ended on March 31, 2017. Again, in relevant part, that section provides:

---

[22] Of course, *Finley Hospital* and *Wilkes-Barre Hospital* both preceded *Reese* and so have nothing to say about it.

33

> Effective the first payroll week following the signing of the collective bargaining agreement, all employees listed by name at the time of the signing of this Agreement shall be guaranteed a five (5) shift mark-up each payroll week for the balance of the Agreement, ending March 31, 2017, except under the following circumstances ….

(J.A. at 217.)[23]

We reject the notion espoused by the Board majority that the participial phrase "ending March 31, 2017" modifies "the Agreement." That does not comport with good grammar. When a comma precedes a participial phrase, the phrase typically modifies a word earlier in the sentence, but, if the phrase is meant to modify the word immediately preceding it, a comma is not used.[24] The comma after the word "Agreement" in this provision matters.

---

[23] As noted *supra*, the exceptions in Section 10.2 do not deal with extending the duration of the provision. Instead, they deal with exceptions to the five-shift guarantee that were available while that provision was in effect. Again, no one argues those exceptions are implicated here.

[24] *See, e.g.*, *Participles*, Purdue Univ., https://owl.purdue.edu/owl/general_writing/mechanics/gerunds_participles_and_infinitives/participles.html (last visited Aug. 23, 2023) ("If a participial phrase comes at the end of a sentence, a comma usually precedes the phrase if it modifies an earlier word in the sentence but not if the phrase directly follows the word it modifies.").

Moreover, reading "ending March 31, 2017" in the phrase "for the balance of the Agreement, ending March 31, 2017" to merely apprise the reader – or perhaps remind the reader – of when the CBA ends does not comport with the text and structure of the CBA or, frankly, common sense. Any party reading the expired CBA would be well aware of the expiration date long before reaching Section 10.2. Indeed, on the cover page, the title begins with: "2014 – 2017 AGREEMENT." (J.A. at 209.) On that same cover page it states the expired CBA is "Effective: November 16, 2014" and "Expires: March 31, 2017." (J.A. at 209.) Furthermore, as noted earlier, the first page of the body of the expired CBA provides an automatic renewal mechanism and explains that, if not renewed, the expired CBA will "continue in force from its effective date until and including the shift starting March 31, 2017[.]" (J.A. at 212.) Again, as previously noted, no one has argued that the requisite notice was not given, or that for some other reason the expired CBA did not terminate on March 31, 2017.

Additionally, Section 10.2 contains two notable features suggesting that the five-shift guarantee was drafted with precision as to its commencement and termination. First, the five-shift guarantee did not become effective when the CBA came into force, which was November 16, 2014. Rather, it became "[e]ffective the first payroll week following the signing of the collective bargaining agreement[.]" (J.A. at 217.) Second, in both instances where the expired CBA is referenced in Section 10.2 – first as "the collective bargaining agreement" and second as the "Agreement" – neither the CBA's effective date nor its expiration date are stated. (J.A. at 217.) Instead, the first date referenced in Section 10.2 is the

35

one indicating that the beginning of the five-shift guarantee is keyed to the signing date. It is only after that, in connection with language addressing the duration of the guarantee, that the date of March 31, 2017 appears. It makes sense to explain with specificity when the guarantee will end, because the guarantee's duration is not coextensive with the entire span of the CBA.

One could perhaps quibble with that reasoning if Section 10.2's phrasing were present elsewhere in the expired CBA, but it is not. That phrasing – "for the balance of the Agreement, ending March 31, 2017" – is unique to Section 10.2. (J.A. at 217.) Indeed, that is highlighted by the General Counsel's and Union's unpersuasive attempts to make hay of other instances in the CBA where some form of durational language is used. None of those instances say *both* "duration" and "ending." And there is no need to do so. For example, the expired CBA prohibits strikes and lockouts "during the term of this Agreement." (J.A. at 237.) But that provision is not incongruous with the span of the expired CBA, nor is it unclear because it lacks the words "ending March 31, 2017." Section 10.2, by contrast, needs and imposes its own, precise endpoint. Similarly, there is one instance providing certain retirees with a choice to participate in a health insurance stipend program "during the life of the 2014-2017 collective bargaining agreement[.]" (J.A. at 230.) Nothing in that language casts doubt on the meaning of Section 10.2 or the parties' intent to provide a specific termination point for the five-shift guarantee.

One final point raised by the Board majority warrants mention here. The Board majority concluded it was "clear that the [five-shift] guarantee, as a contractual matter, was intended

36

by the parties to be in place 'for the balance of the Agreement[,]'" but the majority then said, "the language does not, by its terms, clearly and unmistakably address what happens *after* the 'balance of the Agreement' is over[.]" (J.A. at 32.) We must disagree. There is no question about what happens to the five-shift guarantee *after* that March 31, 2017; it ends, period. There is nothing confusing or odd about that. It is not as if the CBA could not exist without the continuation of Section 10.2. That provision is not essential to comprehending the rest of the CBA or to the functioning of the Post-Gazette. It can hardly be said that the notion of a job without a five-shift guarantee defies imagination. So, if the parties entered into a successor CBA tomorrow that had the same substance as the expired CBA but lacked Section 10.2, no one could reasonably say that the contract was rendered inscrutably vague.

By its terms, then, the five-shift guarantee did not become part of the post-expiration status quo. Rather, in accordance with the parties' express and unambiguous agreement, the guarantee ended on March 31, 2017.

**B. We Will Remand for the Board to Determine Whether the Post-Gazette Engaged in Adequate Effects Bargaining Before Implementing Layoffs**

**1. We Cannot Enforce the Board's Order in Light of Our Holding that the Five-Shift Guarantee did not Become Part of the Post-Expiration Status Quo**

Having concluded that the five-shift guarantee did not become part of the post-expiration status quo, we cannot enforce the Board's order. Although the General Counsel advanced two theories of liability before the ALJ and the Board, we think it plain that the Board addressed only one of those two theories, namely, that the Post-Gazette "violated the Act by unilaterally failing to abide by the 5-shift guarantee with respect to the two employees." (J.A. at 32.) The affirmative statement of the violation that concludes with the just-quoted sentence makes that clear.[25] Furthermore, before us, the General Counsel framed the Board's decision as we just have. (*See, e.g.*, General Counsel Br. at 5 ("Applying the General Counsel's second theory, the Board held that the unilateral elimination of the five-shift guarantee and the layoffs were unlawful because the Post-Gazette was required to maintain the five-shift guarantee as part of the status quo until reaching a new agreement or impasse.") (citing J.A. at 29).)

---

[25] Again as noted *supra*, the Board majority explained the violation as follows:

38

In short, having concluded that the sole basis for the Board's finding of a violation does not withstand scrutiny, we could not enforce the decision under *S.E.C. v. Chenery Corp.*,

> Application of well-settled principles leads to the finding of a violation here. The five-shift guarantee is a mandatory subject of bargaining; it was an established term of employment under the parties' collective-bargaining agreement; and it is not among the categorical exceptions to the *Katz* rule noted in *Litton*. It is therefore clear that the [Post-Gazette] was barred from unilaterally terminating the five-shift guarantee at the expiration of the collective-bargaining agreement (and thereby laying off employees covered by the five-shift guarantee), absent either an impasse in bargaining with the Union or a waiver by the Union of the right to demand compliance with the guarantee on behalf of bargaining unit employees. Here, the parties stipulated that they were not at an overall impasse. And, as we will explain, the parties' collective-bargaining agreement contains no language clearly and unmistakably waiving the Union's statutory right to maintenance of the five-shift guarantee (unless and until the parties reached an impasse in bargaining or a new collective-bargaining agreement). Accordingly, the [Post-Gazette] violated the Act by unilaterally failing to abide by the 5-shift guarantee with respect to the two employees.

(J.A. at 32 (footnotes omitted).)

39

318 U.S. 80 (1943), even if we thought there were a sound alternative basis for it. *See Mercy Cath. Med. Ctr. v. Thompson*, 380 F.3d 142, 151 (3d Cir. 2004) ("[W]e may affirm the agency's decision only on grounds on which the agency actually relied, and not on the basis of alternative rationales or justifications put forward by counsel on appeal.") (citing *Chenery*, 318 U.S. at 87); *see also Slaughter v. N.L.R.B.*, 794 F.2d 120, 122 (3d Cir. 1986) ("In *Sears* a majority of the Board held that the Act *compels* the conclusion that nonunion employees do not enjoy the rights recognized in the *Weingarten* decision. The reasoning of *Sears* was incorporated by reference into the Board's decision in this case. Thus, if we are to sustain the Board's action, it must be on the basis that no other interpretation of the Act is permissible, regardless of whether their order could be sustained on other grounds.") (citing *Chenery*, 318 U.S. at 87).

But that does not end the case. All along, the Post-Gazette has contended that it had the right to implement its proposed layoffs under *First National Maintenance*, so long as it engaged to impasse in good faith "effects" bargaining. As the Union correctly observed at oral argument, however, there has never been a determination that the Post-Gazette did in fact adequately engage in effects bargaining. Even though it prevailed before the ALJ, the Newspaper still filed cross-exceptions, and one of the bases for its cross-exceptions was the ALJ's failure to affirmatively find it had engaged in adequate effects bargaining.

Thus, it would seem straightforward that we should, under the Post-Gazette's theory, remand to the Board with directions to return the matter to the ALJ for a factual finding on the adequacy of the Post-Gazette's effects bargaining. And,

40

if there is a finding of inadequacy of that effects bargaining, the ALJ and Board should be given the opportunity to fashion a proper remedy in keeping with such a violation under *First National Maintenance*. That would be the ordinary course, but this is no ordinary case. We must first deal with another problem that is well-stated in the General Counsel's brief: "[T]he Board held that this is *not* an effects-bargaining case" under *First National Maintenance*. (General Counsel Br. at 42 (emphasis added).)

That remarkable conclusion by the Board was not based on the premise that the Newspaper's decision to go to a digital format is something other than a non-bargainable entrepreneurial decision. To the contrary, the Board majority expressly acknowledged that the decision to "transition to an all-digital format and eliminate 2 days of print publication per week was a core entrepreneurial decision over which the [Post-Gazette] had no duty to bargain." (J.A. at 32 n.18.) Despite that, the Board majority stated in no uncertain terms that "[t]his entrepreneurial decision, however, did not alter the terms of its preexisting collective-bargaining agreement with the Union or the resulting postexpiration status quo that it had a statutory obligation to maintain, including the five-shift guarantee, independent of any effects bargaining obligation." (*Id*.) The Board therefore did not sidestep the *First National Maintenance* question, as the General Counsel has suggested before us both in briefing and at argument. Instead, the Board stated a legal conclusion that is plainly inconsistent with *First National Maintenance*. And because that conclusion addresses a purely legal question, we have no obligation under *Chenery* to give the Board a second bite at the apple.

41

That is especially proper here because the Post-Gazette has pressed its *First National Maintenance* argument at every stage – before the ALJ, before the Board, and before us.[26] We are not required under *Chenery* to turn "judicial review of agency action into a ping-pong game." *Ricketts v. Att'y Gen.*, 955 F.3d 348, 351 (3d Cir. 2020) (quoting *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)). So we will not return this matter to the Board without first "correct[ing] the error of law committed by that body," and only then will we "remand the case to the [agency] so as to afford it the opportunity of examining the evidence and finding the facts as required by law."[27] *Hasan v. U.S. Dep't of Lab.*, 545 F.3d 248,

---

[26] It was in part for this reason that we laid out so fully the parties' arguments in Section 1.D. There is no need to reiterate them here. Simply put, we perceive no forfeiture of this question. *See Geness v. Cox*, 902 F.3d 344, 355 & n.6 (3d Cir. 2018) (noting that arguments not raised in an appellant's opening brief are forfeited); *see also Simko v. U.S. Steel Corp*, 992 F.3d 198, 205 (3d Cir. 2021) ("It is well-established that arguments raised for the first time on appeal are not properly preserved for appellate review."). And we do not run afoul of the "principle of party presentation." *See generally United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[A]s a general rule, our system is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." (internal quotation marks and citation omitted; second alteration in original)).

[27] Because the applicability of the overall impasse rule to effects bargaining is a matter of first impression that neither this Court nor any Court of Appeals has addressed, Judge

42

251 (3d Cir. 2008) (quoting *Interstate Com. Comm'n v. Clyde S.S. Co.*, 181 U.S. 29, 32-33 (1901)).

Accordingly, we turn now to the Board's *First National Maintenance* error. Although the Supreme Court has held that employers need not bargain over changes to "the scope and direction" of their businesses, they must "bargain about the results or effects" of those entrepreneurial decisions. *First National Maintenance*, 452 U.S. at 677 & n.15. The Board's view – that when an employer decides to change the scope of its business during negotiations for a CBA, the employer must bargain to an overall impasse before effectuating its entrepreneurial decision – would render the managerial prerogative of *First National Maintenance* illusory. Unions would gain "a powerful tool for achieving delay," *id.* at 683, as CBA negotiations can take years, *see, e.g.*, J.A. at 4 (observing that the Post-Gazette and the Union have been engaged in negotiations for a successor CBA since March 2017). And it shows no disrespect to unions to observe where their self-interest lies. They have every incentive to avoid change "as long as [the business at issue continues] generating wage payments." Keith N. Hylton, *Efficiency and Labor Law*, 87 Nw. U. L. Rev. 471, 516 (1993). Thus, granting unions a pocket veto over employers' entrepreneurial decisions would undermine the Supreme Court's decision in *First National Maintenance*. *Cf. Arrow Auto. Indus., Inc. v. N.L.R.B.*, 853 F.2d 223, 230 (4th Cir. 1988) (Wilkinson, J.) ("The Supreme Court remains the final arbiter of the meaning of the National

Smith would not rely on *Chenery*'s futility exception and would instead remand without reaching the effects bargaining issue.

43

Labor Relations Act, and its decisions are binding on the Board no less than on the lower courts.").

The Union contends that enabling employers to implement entrepreneurial decisions before entering a CBA or reaching an overall impasse would frustrate contract negotiations by permitting "piecemeal bargaining" that "remov[es] issues from the bargaining agenda [and] make[s] it less likely for the parties to find common ground." (The Union Br. at 24 (quotations omitted).)  Yet the Board has previously recognized that it is "prudent" for parties to "bargain about 'effects' when it is most meaningful to do so." *Show Indus., Inc.*, 326 N.L.R.B. 910, 912 (1998) (plurality).  Accordingly, employers and unions should negotiate immediately over entrepreneurial decisions, even though "other subjects [will] not be[] bargained simultaneously," because changes in the scope of a business will often render other matters "moot or at least less critical." *Id.* at 913.  Those observations track the Supreme Court's statement that "bargaining over the effects of a decision must be conducted in a meaningful manner and at a meaningful time." *First National Maintenance*, 452 U.S. at 681-82.

Finally, as the ALJ here astutely observed, the typical remedy for unilateral changes to the status quo – reinstatement of any terminated employees with full backpay – is a poor fit for entrepreneurial decisions.  The elimination of a line of business often results in redundancies, so when an employer terminates employees pursuant to an entrepreneurial decision without engaging in effects bargaining the Board instead orders the employer to resume negotiations and merely provide "limited backpay" to the laid-off employees. *Transmarine Navigation Corp.*, 170 N.L.R.B. 389, 390 (1968); *see also*

44

*Lapeer Foundry & Mach.*, 289 N.L.R.B. 952, 957 n.11 (1988) ("[R]einstatement with full backpay does not constitute an appropriate remedy for an effects-bargaining violation."). That may hold true here, as reinstating employees who were once needed and had done fine work still makes no sense when there is little or no work for them to do. But we need say no more, as there has been no predicate finding of inadequate effects bargaining. Should such a finding be made, the ALJ and Board may impose a remedy consistent with *Transmarine*.

### III. CONCLUSION

For the foregoing reasons, the General Counsel's petition for enforcement of the Board's order will be denied. The Post-Gazette's petition for review will be granted, except that we will remand for a determination of whether the Newspaper has indeed engaged in adequate effects bargaining and, if not, for the crafting of an appropriate remedy for any effects-bargaining violation.