**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 23-1946 and 23-1976
_____

ALARIS HEALTH AT BOULEVARD EAST

v.

NATIONAL LABOR RELATIONS BOARD

Alaris Health at Boulevard East,
Petitioner in No. 23-1946

NLRB,
Petitioner in No. 23-1976

_____

_____

on Petition for Review and Cross Application for
Enforcement of an Order of the National Labor Relations
Board
(NLRB Docket No. 22-CA-268083)

_____

Argued: **April 10, 2024**

Before: CHAGARES, *Chief Judge*, PORTER, and SCIRICA,
*Circuit Judges*.

(Filed: December 9, 2024)

Stuart A. Weinberger [**ARGUED**]
Weinberger & Weinberger
630 Third Avenue
18th Floor
New York, NY  10017

   *Counsel for Petitioner/Cross-Respondent*

Ruth E. Burdick
Milakshmi V. Rajapakse
David A. Seid [**ARGUED**]
National Labor Relations Board
Appellate and Supreme Court Litigation Branch
1015 Half Street SE
Washington, DC  20570

   *Counsel for Respondent/Cross-Petitioner*

_____

OPINION OF THE COURT
_____

**SCIRICA**, *Circuit Judge*

In April 2020, petitioner/cross-respondent Alaris Health

2

at Boulevard East (the "Company"), a nursing home, decided to pay its employees bonuses in recognition of their efforts at the beginning of the COVID-19 pandemic. The bonuses took the form of temporary salary increases. Over the next few months, the Company gradually reduced those raises until salaries returned to almost original levels. As well-intended as this gesture may have been, the Company did not give the union representing its employees notice or an opportunity to bargain prior to initiating and scaling back the bonus raises.

The National Labor Relations Board (the "Board")[1] determined the COVID-19 bonuses were wages subject to mandatory bargaining under the Act, and that a management rights clause in the parties' collective bargaining agreement purporting to authorize the Company's actions did not survive the agreement's expiration. Because the Board's factual findings were supported by substantial evidence, and because the Board reached the right answer as to the parties' collective bargaining agreement, we will deny the Company's petition for review. Moreover, because the Company repeatedly failed to address the remedy charged by the General Counsel and ultimately adopted by the Board, we will grant the General Counsel's cross-petition for summary enforcement.

---

[1] We refer to the body whose decision we are reviewing as the "Board," and the party appearing before us on the Board's behalf (i.e., respondent/cross-petitioner) as the "General Counsel." In addition, we refer to the National Labor Relations Act, 29 U.S.C. §§ 151 et seq., as the "Act."

I.

A.

The Company owned and operated six nursing homes/rehabilitation centers providing inpatient medical services. The facility at issue in this case was in Guttenberg, New Jersey, and closed on November 15, 2020. Prior to its closure, 1199 SEIU United Healthcare Workers East (the "Union") was the collective-bargaining representative for a unit of the facility's employees, including "[a]ll CNAs, dietary, housekeeping, recreational aides, [and] cooks." App. 9.[2] The Company and the Union's relationship was governed by a collective bargaining agreement (the "CBA"), effective by its terms from April 1, 2010, through March 31, 2014, and "automatically renewed for an additional period of four (4) years unless either party notifies the other in writing." App. 467. As relevant here, the CBA contains a management rights clause[3] providing that "[n]othing herein contained shall

---

[2] While the Union represented "CNAs" or certified nursing assistants, it did not represent "registered nurses" (RNs) or licensed practical nurses ("LPNs") working at the facility. App. 435.

[3] A management rights clause is a "contractual provision that authorizes an employer to act unilaterally, in its discretion, with respect to a mandatory subject of bargaining." *E.I. Dupont De Nemours, Louisville Works*, 355 N.L.R.B. 1084, 1085 (2010), *enforcement denied on other grounds*, 682 F.3d 65 (D.C. Cir. 2012); *see also Chi. Tribune Co. v. NLRB*, 974 F.2d 933, 937 (7th Cir. 1992) ("The union had a statutory right to bargain over the terms of employment, . . . but it gave

4

prevent the [Company] from giving merit increases, bonuses, or other similar payments provided it gives prior notice to the Union before implementation." App. 446.

In early 2020, the Company began experiencing extreme operational difficulties at the onset of the COVID-19 pandemic. As the Company's former Vice President testified,

> [O]nce COVID hit a facility, or a particular neighborhood, it hit and it hit rapidly. . . . [I]t was a very chaotic time period. It was a frightening time period. Facilities and . . . staff in facilities were really struggling for a number of reasons. Whether it be keeping up with all of the new regulations and guidance, that was coming by rapid fire from various agencies. In addition to staff fears, staff animus[,] . . . . there was a lot of information, and a lot of emotions, and also our patients at the other end of that, that needed to be taken care of, with dwindling staff resources.

App. 183-84. The pandemic created operational difficulties for the Union as well. Most notably, New Jersey's shelter-in-place mandate prevented the Union's representatives from accessing the facility as required by the CBA. In response, the Union sent a letter to the Company on March 30, 2020, reminding the Company that "federal labor law prohibits the Facility from changing wages, hours, benefits, or any other term or condition of employment without giving the Union prior notice and an

---

up that right, so far as the subjects comprehended by the management-rights clause were concerned, by agreeing to the clause.").

5

opportunity to bargain." App. 474.

Despite this warning, on April 1, 2020, the Company issued a memo to its employees announcing that "to [e]nsure the safety and recognize the commitment and hard work of our dedicated healthcare workers on the front lines fighting this pandemic," the Company would issue "a special COVID19 hourly rate bonus" to all staff. App. 475. Per the memo, the bonuses would be "equal to 25% of [each employee's] current hourly rate," "effective Thursday, April 2nd and thru at least April 30th," and would apply "to all worked hours (excluding any paid-time-off pay)." *Id.* On April 7, the Company published a second memo increasing the bonuses for all nursing staff to "100% of their current hourly rate." App. 479. Once again, the bonuses were to recognize "the challenge of navigating the ongoing COVID19 Pandemic" and would "apply to all worked hours (excluding sick or benefit time)" "effective immediately through April 30th." *Id.*

The Company did not directly communicate these bonus announcements to the Union. Instead, after learning of the first bonus announcement from an employee, the Union emailed the Company on April 1 stating it "agree[d]" with the "proposed . . . 25% wage increase." App. 476. The Company responded on April 2, asserting that "[t]he temporary increase for our employees is well within our management rights" and "solely to recognize the outstanding efforts of our dedicated staff." App. 477. The Company also noted that it "will not be distracted because there is too much at risk" given that "[a]dministration and its staff are dealing with and making critical real-life decisions every minute of every day." *Id.* The Union responded the following day reiterating that it "promptly accepted, without any fuss, the proposed wage

increase," but reminding the Company that "[t]he Union is entitled to notice and an opportunity to bargain before any changes (including modifications to the already implemented and agreed to increases) are implemented." App. 478. Upon learning of the second bonus memo, the Union sent additional emails on April 7 and April 8, again agreeing to the increase but reiterating that it was "entitled to notice and an opportunity to bargain before any future changes (including modifications to the agreed to increases) are implemented." App. 480; *see also* App. 481. The Company did not respond.

Beginning April 29, the Company published a series of memos scaling back the previously announced bonuses. Specifically, on April 29, the Company announced that effective May 1 and through May 14, the 100% hourly bonus for nursing staff would be reduced to 25% for all hours worked. On May 13, the Company announced that effective May 17 through May 31, the 25% hourly bonus would be limited to "Direct Nursing Providers" (including RNs, LPNs, and CNAs), whereas "all other employees will return to their normal hourly rate." App. 483. On May 29, the Company announced that effective May 31 through June 15, the 25% hourly bonus for RNs and LPNs would be reduced to 10%, and that after June 15 RNs and LPNs would return to their "traditional [hourly] rate." App. 485. And finally, on July 20, the Company announced that effective July 26, the 25% bonus payments for all CNAs would be reduced to $1.50 extra per hour for all hours worked.[4] With each new memo, the Union emailed the Company objecting to the reduction and reminding

---

[4] This $1.50 increase remained in effect until the Company's closure in November 2020.

the Company that it was required to provide the Union with advanced notice and an opportunity to bargain. The Company never responded.

Separately, on September 4, 2020, the Union filed a class action grievance on behalf of its members "for unpaid medical invoices and the cancellation of their health insurance benefits" after "unit members had accumulated hospital bills that were not being covered by their health insurance." App. 11-12. The Union issued an "Information Request" to the Company on September 8 for "files that show names and date of member[s] covered as of March 1, 2020," "[t]he summary plan and description for health insurance," and "[t]he summary benefit description for health insurance." App. 12. The Union never received the requested information.

B.

On August 30, 2021, the General Counsel issued a complaint, compliance specification, and notice of hearing alleging violations of sections 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1), bypassing the Union and rescinding, reducing, and discontinuing wage increases without first notifying the Union or providing the Union with an opportunity to bargain; and refusing to provide the Union with requested information relevant to its representation of bargaining-unit employees. The General Counsel sought make-whole relief for the employees. App. 294. The compliance specification contained allegations of specific amounts owed to each bargaining-unit employee as well as compensation for any adverse tax consequences of receiving lump-sum backpay payments.

8

The complaint notified the Company that it was required to file an answer by September 20, 2021, and that such answer must "state any basis for any disagreement with any allegations that are within the [Company's] knowledge" and "furnish the appropriate supporting figures," and that "a general denial is not sufficient." App. 296-97. Despite this notice, the Company's answer to the compliance specification merely stated that "the allegations set forth were legal conclusions to which no response was required." App. 3. On October 20, 2021, the General Counsel notified the Company that its answer was deficient because it "contains general denials and conclusionary statements without setting forth the basis for such disagreement" and thus "does not comport with the specificity requirements of . . . the Board's Rules and Regulations." App. 429. The General Counsel further warned that if the Company did not amend its answer by October 27, 2021, the General Counsel would move for summary judgment with respect to those allegations. The Company failed to respond.

The case was tried remotely over three days before an Administrative Law Judge ("ALJ") starting on November 1, 2021. The ALJ heard testimony from three witnesses—two Union employees and the Company's former vice president. At the start of the hearing, the General Counsel moved for partial summary judgment as to the remedy charged in its compliance specification, arguing the Company's general denials failed to comply with Board regulations. The ALJ invited the Company to file an opposition to the motion, but the Company failed to do so.

On January 26, 2022, the ALJ issued its decision finding in relevant part for the Company. The ALJ found "the bonuses

were for a specific period of time and not conditioned upon employment-related factors" since such a wage increase "would have resulted in a significant and substantial windfall to the unit employees." App. 14. As such, "[i]t is difficult to believe," reasoned the ALJ, that "the Union seriously thought there was an increase of 100 percent in hourly wages and that the increase was not in fact a gift in the form of a bonus." *Id.* The ALJ further noted that "[n]one of the monetary increases were tied to performance, seniority, production, attendance or dependent on gross profits of the facility," but rather "[t]he bonuses were implemented to show appreciation to the staff when the COVID-19 pandemic started in March 2020[,] and the bonuses were ended when the pandemic lessen[ed] in summer 2020." App. 15. Accordingly, the ALJ determined the COVID-19 bonuses were gifts rather than wage increases and thus not subject to mandatory bargaining under the Act.

The ALJ also found the bonuses were authorized by the management rights clause in the CBA. While noting the CBA expired in 2014, the ALJ reasoned "an employer has a statutory duty to maintain the status quo on mandatory subjects of bargaining" and the "substantive terms of the expired agreement generally determine the status quo." App. 13. Even though the "bonuses were unprecedented," the ALJ concluded the Company's "right under the [CBA] to give out bonuses upon notice to the Union without having to bargain," survived the CBA's expiration, and that the Union received sufficient notice of the bonuses. However, the ALJ found the Company violated the Act by failing to respond to the Union's information request and ordered compliance within twenty-one days. The ALJ did not address the General Counsel's partial summary judgment motion.

10

The General Counsel filed exceptions to the ALJ's decision. In doing so, the General Counsel specifically challenged the ALJ's failure to rule on its partial summary judgment motion. The Company once again failed to address the partial summary judgment motion in its answering brief. Nor did the Company object to the ALJ's decision concerning the information request.

On November 23, 2022, the Board reversed the ALJ's finding of no violation. The Board found the bonuses were sufficiently tied to "employment-related factors" because "attendance was a prerequisite," and "employees would not receive any hourly rate bonus for hours not worked because of vacation, sick leave, or any other reason." App. 2. Moreover, the bonuses "reflected the reality that working closely with residents in a nursing home during the early days and months of the pandemic meant exposure to risk of infection." *Id.*; *see also* App. 3 n.9 ("In finding that the bonuses were gifts, the judge appears to have been influenced in part by his view that they represented a 'significant and substantial windfall' to employees. We disagree with this characterization in light of the fact that employees earned the bonuses by providing care to residents of the Respondent's facility during a pandemic."). As such, the bonuses were "a form of hazard pay, which is a mandatory subject of bargaining." App. 2.

The Board also rejected the ALJ's finding that the management rights clause in the CBA permitted the Company to unilaterally rescind the bonuses because, according to the Board, the management rights clause did not survive the CBA's expiration. The Board reasoned that "provisions in an expired collective-bargaining agreement do not cover post-expiration unilateral changes unless the agreement contained

11

language explicitly providing that the relevant provision would survive contract expiration." App. 3 n.10 (citation omitted). And the parties' management rights clause "does not specify, either implicitly or explicitly, that it would survive after the agreement's expiration." *Id.*

Lastly, the Board granted General Counsel's partial summary judgment motion and ordered the make-whole remedy charged in the compliance specification. The Board reasoned,

> It is well settled that a general denial of backpay calculations is insufficient to comply with [the Board's regulations] where the answer fails to specify the basis for the disagreement with the backpay computations contained in the specification, fails to offer any alternative formula for computing backpay, fails to provide appropriate supporting figures for amounts owed, or fails to adequately explain any failure to do so. Moreover, the gross backpay owed to employees in this case is clearly within the [Company]'s knowledge because its payroll department modified staff bonuses from April to November 2020.

App. 4. The Board also affirmed the ALJ's decision with respect to the Company's failure to respond to the Information Request.

After unsuccessfully moving for reconsideration, the Company petitioned this Court for review of the Board's decision. The General Counsel cross-petitioned for

12

enforcement.

## II.

The Board had jurisdiction over this matter pursuant to 29 U.S.C § 160(a). *See New Concepts for Living, Inc. v. NLRB*, 94 F.4th 272, 279 (3d Cir. 2024). We have jurisdiction to consider the Company's petition and the General Counsel's cross-petition under 29 U.S.C. § 160(e) and (f). *Id.* at 279-80.

We review the Board's factual findings for substantial evidence. *See, e.g.*, *NLRB v. ImageFIRST Uniform Rental Serv., Inc.*, 910 F.3d 725, 732 (3d Cir. 2018). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *1621 Route 22 W. Operating Co., LLC v. NLRB*, 825 F.3d 128, 144 (3d Cir. 2016) (citation omitted). We thus uphold the Board's conclusions of fact "even if we would have made a contrary determination had the matter been before us *de novo*." *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001). Where, as here, the Board adopts in part the factual findings of an ALJ, we review the determinations of both the Board and the ALJ. *Trafford Distrib. Ctr. v. NLRB*, 478 F.3d 172, 179 (3d Cir. 2007). "But we owe the Board no deference on matters of contractual interpretation, even when undertaken in connection with unfair labor practice proceedings." *PG Publ'g Co. v. NLRB*, 83 F.4th 200, 211 n.16 (3d Cir. 2023).

## III.

We begin with the Company's petition for review. The Company argues the COVID-19 bonuses were gifts rather than

13

wage increases and thus not subject to mandatory bargaining under the Act. But even if the bonuses were wage increases, the Company posits, they would still be authorized by the management rights clause in the CBA which survived the CBA's expiration. We will address each argument in turn.

## A.

Employees have the right under the Act "to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. An employer thus violates subsections 8(a)(5) and (1) of the Act by "refus[ing] to bargain collectively with the representatives of his employees," *id.* § 158(a)(5); *accord N.J. Bell Tel. Co. v. NLRB*, 720 F.2d 789, 791 n.2 (3d Cir. 1983), as well as by enacting "unilateral change[s] in conditions of employment" because "it is a circumvention of the duty to negotiate which frustrates the objectives of [the Act] much as does a flat refusal," *NLRB v. Katz*, 369 U.S. 736, 743 (1962). *See also Leeds & Northrup Co. v. NLRB*, 391 F.2d 874, 877 (3d Cir. 1968) ("The principle at the heart of [the Act] is that basic terms which are vital to the employees' economic interest, such as wages, may not be altered unilaterally by the employer without bargaining with [union representatives].").  The mandatory duty to bargain is limited to "wages, hours, and other terms and conditions of employment."  29 U.S.C. § 158(d).  "[A]s to all other matters, each party is free to bargain or not to bargain." *N. Am. Pipe Corp.*, 347 N.L.R.B. 836, 837 (2006), *enforced sub nom. Unite Here v. NLRB*, 546 F.3d 239 (2d Cir. 2008).  In particular, "gifts per se—payments which do not constitute compensation for services—are not terms and conditions of employment, and an employer can make or decline to make such payments as he pleases." *NLRB v. Wonder State Mfg. Co.*, 344 F.2d 210, 213 (8th Cir. 1965).

In distinguishing between wages and gifts, we ask whether the award is "so tied to the remuneration which employees received for their work that it was in fact part of it." *Unite Here*, 546 F.3d at 243 (quotation marks and brackets omitted). A sufficient relationship to remuneration may exist if the payment is tied to various "employment-related factors." *Benchmark Indus.*, 270 N.L.R.B. 22, 22 (1984), *enforced sub nom. Amalgamated Clothing v. NLRB*, 760 F.2d 267 (5th Cir. 1985). Those factors include "work performance, wages, hours worked, seniority, and production." *Unite Here*, 546 F.3d at 243; *see also Radio Television Tech. Sch., Inc. v. NLRB*, 488 F.2d 457, 460 (3d Cir. 1973) (considering "(1) the consistency or regularity of the payments; (2) the uniformity in the amount of the payments; (3) the relationship between the amount of the bonus and the remuneration of the recipient; (4) the taxability of the payment as income; and (5) the financial condition and ability of the employer" as relevant factors to the gift or wage determination). "An award that is sufficiently tied to these work-related factors is considered part of the overall compensation that an employee receives and is therefore mandatorily bargainable." *Unite Here*, 546 F.3d at 243.

In this case, the Board's determination that the COVID-19 bonuses were so tied to remuneration that they were in fact part of it was supported by substantial evidence. *See id.* at 244 (reviewing for substantial evidence the question of "whether the stock award is so tied to remuneration that it is in fact a part of it"). The bonuses were tied to relevant "employment-related factors." *Benchmark Indus.*, 270 N.L.R.B. at 22. For example, the Board determined that "attendance was a prerequisite to receiving any hourly rate bonus" based on the Company's memos on April 1 and April 7 announcing the bonuses. App. 2; *see, e.g.*, *Sykel Enters., Inc.*, 324 N.L.R.B. 1123, 1124

15

(1997) (finding Christmas bonuses were wages because the company "looked at the attendance and performance of the . . . employees in determining how much of a Christmas bonus to give each employee"); *Woonsocket Spinning Co.*, 252 N.L.R.B. 1170, 1172 (1980) (finding holiday bonuses that were calculated by multiplying the number of hours worked by years of employment could not be unilaterally rescinded). Those memos explicitly limited the bonuses to "all hours worked," and made clear that employees would not "receive any hourly rate bonus for hours not worked because of vacation, sick leave, or any other reason." App. 1, 2, 126; *see* App. 475 (April 1 memo "excluding [from the bonuses] any paid time-off pay"); 479 (April 7 memo "excluding sick or benefit time").

In addition, the bonuses were not paid equally to each employee, but instead were calculated based on job type and current hourly rate. While the April 1 memo announced an equal 25% salary bump for all employees, the April 7 memo increased the bonuses to 100% just for nursing staff, while the remaining employees remained at 25%. Then, after reducing the nurses' bonuses back to 25% on April 29, the Company limited the bonus to "Direct Nursing Providers only" on May 13 whereas all other employees returned to their normal hourly rate as of May 17. And finally, on May 29, the Company cut bonuses for RNs and LPNs from 25% to 10% until June 10, after which time they returned to normal salary levels, while the CANs remained at 25% until July 26, after which they received a permanent increase of $1.50 per hour. Thus, the availability and amount of bonus each employee received depended on his or her position and hourly rate. *See, e.g.*, *Radio Television Tech. Sch., Inc.*, 488 F.2d at 460 (Christmas bonuses considered gifts when they were "based upon the

16

employees' length of service and the nature and scope of their employment responsibilities").

And finally, while the memos claimed that each salary change was temporary and subject to reevaluation, the Board acknowledged this factor, but concluded that it was outweighed by other considerations. *See* App. 2 n.7 ("The judge correctly observed that the Board also considers the regularity of a bonus in determining whether it is a term and condition of employment, but this factor is neither necessary nor sufficient in the analysis."); *see also Unite Here*, 546 F.3d at 244 (finding substantial evidence to uphold the Board's decision when the Board "majority acknowledged that [an employment-related] factor might cut against treatment of the stock award as non-bargainable, but concluded that this factor was outweighed by other considerations"). And regardless, as the Board pointed out, the Company's final change—an increase in $1.50 per hour for all CNAs—remained in effect until the facility closed in November 2020. App. 1 & 2 n.7. As such, "[t]he permanence of that pay increase further supports the conclusion that the bonuses were a mandatory subject of bargaining." App. 2 n.7.

The Company's reliance on *Unite Here v. NLRB* is unpersuasive. In fact, *Unite Here* better supports the General Counsel, not the Company. In that case, the Second Circuit denied a petition for review of the Board's decision holding that a one-time stock issuance to all employees was a gift rather than a wage increase because "[t]he stock award . . . was a one-time event, given to each employee, regardless of rank, in an equal amount." 546 F.3d at 244. In contrast, the COVID-19 bonuses were distributed over the course of several months and varied in amount based on the employee's hourly salary and

17

job title. Accordingly, the Board's finding that the bonuses were tied to employment-related factors is supported by substantial evidence.

The Board also determined the bonuses were "a form of hazard pay, which is a mandatory subject of bargaining." App. 2. No decision of the Board to our knowledge has ever recognized "hazard pay" as part of the "terms and conditions of employment" under the Act.[5] "We recognize that classification of bargaining subjects as terms and conditions of employment is a matter concerning which the Board has special expertise." *Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 182 (1971)

---

[5] The Board's citation to *Hospital Menonita De Guayama, Inc.*, 371 N.L.R.B. No. 108, 2022 WL 2355898 (June 28, 2022), *enforced*, 94 F.4th 1 (D.C. Cir. 2024), is unconvincing. While true the Board in that case adopted the ALJ's finding that a Company violated the Act by unilaterally giving $150 bonus checks to employees who worked during a hurricane, it failed to provide any reasoning except that "[g]ifts or bonuses tied to the remuneration that employees receive for their work constitute compensation for services and are in reality wages falling within the Statute." 2022 WL 2355898, at *16. Moreover, that case involved more obviously illegal conduct from the employer—most notably, the recission of benefits and unilateral modification of health care policies, *id.* at *9, and dealt primarily with a legal issue not presented here—the fate of the successor bar rule. *Id.* at *8. Neither the ALJ nor the Board in their decisions nor our sister circuit in its enforcement order discussed the concept of or even used the words "hazard pay."

18

(quotation marks and parentheses omitted).  Accordingly, we have traditionally deferred to the Board's interpretations of the Act so long as they are "reasonable."  *See, e.g.*, *MCPC, Inc. v. NLRB*, 813 F.3d 475, 482 (3d Cir. 2016); *see also Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979) (holding the Board's interpretation of the Act should be enforced so long as it is "reasonably defensible," and refusing to enforce the Board's interpretation only when it has "no reasonable basis in law," is "fundamentally inconsistent with the structure of the Act and an attempt to usurp major policy decisions properly made by Congress," or "mov[es] into a new area of regulation which Congress has not committed to it" (citations and quotation marks omitted)).

Whether this deference survives the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), which overruled *Chevron* deference, is somewhat of an open question.  It would appear to us, however, that judicial deference to the Board's classifications of the "terms and conditions of employment" under the Act is distinct from *Chevron* deference, as the Supreme Court's decisions developing that deference to the Board predate *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See, e.g.*, *Ford Motor Co.*, 441 U.S. at 496-97 (collecting cases).  In fact, the Court in *Loper Bright* distinguished *Chevron* deference from prior cases where it deferred to the Board's interpretation of the Act, reasoning "[t]he Act had, in the Court's judgment, assigned primarily to the Board the task of marking a definitive limitation around the [relevant statutory] term" and so "application of [the] statutory term was sufficiently intertwined with the agency's factfinding" that deference to the Board's interpretation was warranted.  144 S. Ct. at 2259-60 (citations and quotation marks omitted); *see*

19

*also Ford Motor Co.*, 441 U.S. at 496 (noting "Congress made a conscious decision to continue its delegation to the Board of the primary responsibility of marking out the scope of the statutory language and the statutory duty to bargain"). *But see, e.g.*, *Allegheny Ludlum Corp. v. NLRB*, 301 F.3d 167, 174-75 (3d Cir. 2002) (reciting our deferential standard to the Board's interpretations of the Act but noting "[o]ur standard is governed by the test articulated in *Chevron*"); *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 147 (3d Cir. 1994) (Alito, J.) (similar).

Ultimately, we need not decide whether deference to the Board's designation of mandatory bargaining subjects under the Act survives the Supreme Court's rejection of *Chevron* deference in *Loper Bright*. Even on de novo review, we reach the same conclusion as the Board—that hazard pay is appropriately considered the "terms and conditions of employment" and thus subject to mandatory bargaining under the Act. The Department of Labor defines hazard pay as "additional pay for performing hazardous duty or work involving physical hardship." Hazard Pay, U.S. Dep't of Labor (last visited Aug. 14, 2024), https://www.dol.gov/general/topic/wages/hazardpay. And in the federal employee context, Congress has authorized the Office of Personnel Management "to provide additional compensation at fixed rates (pay differentials) to salaried, General Schedule employees for duty involving unusual physical hardship or hazard," or "for duty involving unusually severe working conditions or unusually severe hazards." *Adams v. United States*, 59 F.4th 1349, 1351-52 (Fed. Cir. 2023) (en banc) (quotation marks omitted); *see* 5 U.S.C. §§ 5543(c)(4), 5545(d). The purpose of these programs is "to serve as a gap-filling measure to provide additional remuneration to an employee asked to take unusual risks not

normally associated with their occupation and for which added compensation is not otherwise provided." *Adams*, 59 F.4th at 1352 (quotation marks omitted). Given that hazard pay is simply a subset of one's salary or "remuneration," it clearly falls under "wages" or "other terms and conditions of employment" as used in the Act and therefore subject to mandatory bargaining. Thus, the Board's conclusion that "hazard pay . . . is a mandatory subject of bargaining" was not erroneous. App. 2. *See also NLRB v. Metro Man IV, LLC*, 113 F.4th 692, 697-700 (6th Cir. 2024) (assuming without deciding that hazard pay is subject to mandatory bargaining under the Act).

In addition, the Board's factual finding that the COVID-19 bonuses were properly "considered a form of hazard pay" is supported by substantial evidence. *Id.* At the hearing, the Company's former Vice President described the situation at the facility at the onset of the COVID-19 pandemic as "chaotic" and "frightening." App. 183. She said the facility was "struggling" to "keep[] up with all of the new regulations and guidance[] that w[ere] coming by rapid fire" and that there was "a lot of emotions" and "dwindling staff resources." *Id.* at 183-84. The Company further recognized the difficulty of this time in its communications regarding the bonuses. In the April 1 memo, the Company alluded to the "challenges surrounding the COVID19" and described the pandemic as a "medical crisis." App. 475. In its April 2 email to the Union, the Company referred to the pandemic as an unprecedented "global emergency." App. 477 (stating the facility "is in the epicenter of the Covid-19 pandemic — *the likes of which no one has ever experienced*" (emphasis added)). And on April 7, the Company again described the pandemic as "most challenging times." App. 479. Moreover, that nursing staff

21

received larger bonuses and for longer periods of times is consistent with the Board's hazard pay finding because nurses would have had the most direct exposure to the risks surrounding COVID-19. Thus, substantial evidence supports the Board's factual finding that the bonuses were a form of hazard pay meant to compensate for the "reality that working closely with residents in a nursing home during the early days and months of the pandemic meant exposure to risk of infection." App. 2.

In sum, the Board's factual findings that the COVID-19 bonuses were tied to employment-related factors and represented a form of hazard pay such that they were properly considered wages or other terms and conditions of employment were supported by substantial evidence. The bonuses were therefore subject to the mandatory duty to bargain under the Act.

Lastly, relying on the Sixth Circuit's recent decision in *Metro Man IV*, the Company argues it was excused from any duty to bargain under the Act even if the bonuses were hazard pay because of "exigent circumstances" created by the pandemic. Dkt. 44 (Sept. 9, 2024 Letter); 113 F.4th 692 (6th Cir. 2024). At no point did the Company raise the doctrine of economic exigency before the Board or ALJ. But even if this argument were properly before us, there is no substantial evidence that the pandemic created "exigent *economic* circumstances" for the Company such as mass staffing shortages or a mass outbreak of COVID-19 at the facility. *Cf. Metro Man IV*, 113 F.4th at 695, 699-700 (emphasis added) (holding "exigent economic circumstances" excused employer from its duty to bargain over hazard pay when "[a]pproximately 75% of . . . unionized staff, including nurses,

22

stopped coming to work" after nursing home residents began contracting COVID). Furthermore, *Metro Man IV* does not cover, let alone declare lawful, the type of unilateral action that the Company took here—announcing, repeatedly altering, and ultimately terminating bonuses without any reference to previous announcements or "terms." Rather, the employer in *Metro Man IV* had expressly time-limited its temporary hazard pay policy *at the outset* by noting that it would only apply until the employer's facility had "treated its last COVID patient." *Id.* at 698. Here, the Company did not attach any limitations to the bonuses at the outset, nor in subsequent alterations. And whereas in *Metro Man IV*, the termination of the hazard pay policy before the union even learned of it meant, effectively, that "nothing remained to bargain about," *id.* at 700, here, the union was aware of the Company's changes to the COVID-19 bonuses at every step. Accordingly, we conclude the Company was obligated to bargain at every step of the Company's implementation of and changes to the bonuses. In sum, the facts and issues presented in *Metro Man IV* are wholly distinct from those we consider here.

B.

We next consider whether the management rights clause in the parties' CBA authorizes unilateral payment of the COVID-19 bonuses notwithstanding the Act. "When a union and an employer enter into a collective bargaining agreement, each party may waive certain rights they otherwise would possess under the [Act] . . . ." *Verizon New England Inc. v. NLRB*, 826 F.3d 480, 482 (D.C. Cir. 2016) (Kavanaugh, J.); *see also, e.g.*, *Engelhard Corp. v. NLRB*, 437 F.3d 374, 378 (3d Cir. 2006) (noting "the statutory right to strike may be waived in a collective bargaining agreement," and collecting cases).

23

The CBA in this case contains a management rights clause which states that "[n]othing herein contained shall prevent the Employer from giving merit increases, bonuses, or other similar payments provided it gives prior notice to the Union before implementation." App. 446. The parties do not dispute this clause provides the Company unilateral authority with respect to the bonuses, provided it gives the Union prior notice. But the Board found the CBA expired in 2014, long before the Company implemented its COVID-19 bonus program in 2020. The critical question therefore is whether the management rights clause survives the CBA's expiration and forms part of the post-expiration status quo.[6]

In general, "contractual obligations will cease, in the ordinary course, upon termination of [a collective] bargaining agreement." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991). But "terms and conditions continue in effect by operation of the [Act]. They are no longer agreed-upon terms; they are terms imposed by law, at least so far as there is no unilateral right to change them." *Id.* at 206. In this way, subsections 8(a)(1) and (5) require "continuation of the status quo" during negotiations over a successor CBA. *Katz*, 369 U.S. at 746. And so "an employer commits an unfair labor practice . . . when, after the expiration of a CBA and during negotiations for a successor CBA, the employer alters the post-expiration status quo regarding the terms and conditions of employment without first negotiating with its employees to an

---

[6] We review de novo the question of whether a provision in a collective bargaining agreement forms part of the post-expiration status quo. *See, e.g.*, *PG Publ'g*, 83 F.4th at 211-12 & n.16.

24

overall impasse on the successor CBA." *PG Publ'g*, 83 F.4th at 205.

We recently discussed the framework for analyzing whether a CBA provision forms part of the post-expiration status quo in *PG Publishing*. There, a provision guaranteeing employees five work shifts per week did not form part of the post-expiration status quo. In so holding, we rejected the Board dissent's "sweeping proposition" that "terms in an expired CBA form part of the post-expiration status quo only where there is some explicit statement by the parties." *Id.* at 217. We also declined to adopt the Board majority's view that "any provision touching on subjects of mandatory bargaining is by law included in the post-expiration status quo." *Id.* at 214. Instead, the proper analysis examines "the language of the CBA in question" using "ordinary principles of contract interpretation":

> If the language of the CBA does not indicate that the term in question persists as part of the status quo, the inquiry ends. If, but only if, the contract indicates in some fashion that the term does form part of the post-expiration status quo – and therefore continues to govern the parties by operation of the [Act] – then the employer must meet the clear-and-unmistakable-waiver standard if it wishes to assert that its employees have waived their statutory right to the benefits of the contested term.

*Id.* at 212-13.

The Company urges that under the standard announced

25

in *PG Publishing*,[7] the management rights clause survives the CBA's expiration because "[t]he facts found in the *PG Publishing* case mirror the facts in the instant case." Company's Br. 23. To the contrary, while both this case and *PG Publishing* involve the general question of whether a provision in an expired CBA survives contract expiration, their

---

[7] The Board's decision predates *PG Publishing*. As such, the Board did not have opportunity to apply our "ordinary principles of contract law" approach to the instant case. Rather, it looked to its own decision in *Nexstar Broadcasting, Inc.* for the proposition that "provisions in an expired collective-bargaining agreement do not cover post-expiration unilateral changes unless the agreement contained language explicitly providing that the relevant provision would survive contract expiration." App. 3 n.10 (quoting *Nexstar Broad. Inc.*, 369 N.L.R.B. No. 61, 2020 WL 1986474, at *3 (Apr. 21, 2020), *enforced*, 4 F.4th 801 (9th Cir. 2021)). Our decision in *PG Publishing* of course rejected the "clear and unmistakable language" rule endorsed by the Board and our sister circuit in *Nexstar*. *See PG Publ'g*, 83 F.4th at 217; *accord Nexstar*, 4 F.4th at 809 (holding "contract rights only survive expiration if the CBA explicitly so provides"). Thus we ordinarily would grant the petition for review and remand for further consideration in light of *PG Publishing*. *See, e.g.*, *NLRB v. A. Duie Pyle, Inc.*, 730 F.2d 119, 128 (3d Cir. 1984) ("We have made it crystal clear that a Board's decision ignoring our precedents will not be enforced."). But because we review issues of contract interpretation de novo, and because, as explained *infra*, we reach the same decision as the Board under our ordinary principles of contract law approach, we will deny the petition for review.

underlying facts are materially different. The provision in *PG Publishing* guaranteed five shifts per week, which the employees were not otherwise entitled to by default under the Act. In contrast, the provision here waives the employees' right to bargain over certain wage increases—a right guaranteed under the Act. Thus, while both provisions touch on subjects of mandatory bargaining, one creates a right whereas the other waives a right, and we did not suggest in *PG Publishing* that these two different types of provisions must be analyzed and treated the same way under the Act. Moreover, the contract provision in *PG Publishing* was "drafted with precision" and contained "clear and unambiguous" durational language. 83 F.4th at 217-18 (reading the participial phrase "ending March 31, 2017" to modify the five-shift guarantee and demonstrate the parties' unambiguous intent that the five-shift guaranteed would expire with the CBA). In contrast, the management rights clause here is silent concerning its duration. Nor do we discern any durational clues from the other provisions in the CBA.

We did not provide any guidance in *PG Publishing* on how to address such silence, except to say "the inquiry ends." *Id.* at 213. Thus, per ordinary principles of contract law, the durational silence in the management rights clause suggests it did not survive the CBA's expiration to form part of the post-expiration status quo. *See Pittsburgh Mailers Union Loc. 22 v. PG Publ'g Co. Inc.*, 30 F.4th 184, 188 (3d Cir. 2022) ("According to [ordinary contract] principles, if a specific provision does not have its own durational clause, the general durational clause of the CBA applies." (citing *CNH Indus. N.V. v. Reese*, 538 U.S. 133, 140-41 (2018) (per curiam))); *see also M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441 (2015) ("[C]ourts should not construe ambiguous writings [in

27

contracts] to create lifetime promises." (citing 3A Corbin, Corbin on Contracts § 553, p. 216 (1960))).  But we may also seek guidance from federal labor policy in interpreting ambiguous contract provisions, for federal labor policy illustrates the parties' understanding at the time they formed the CBA.  *Cf. PG Publ'g*, 83 F.4th at 216 ("[W]e interpret collective-bargaining agreements according to ordinary principles of contract law, *at least when those principles are not inconsistent with federal labor policy*." (brackets and ellipses omitted) (emphasis added) (quoting *Finley Hosp. v. NLRB*, 827 F.3d 720, 725 (8th Cir. 2016))); *see also Tackett*, 574 U.S. at 435 (same).  We have long espoused the Board's policy that "waivers of statutorily protected rights must be clearly and unmistakably articulated" and absent some clear statement to the contrary, a "management rights clause does not survive the expiration of the CBA." *Furniture Rentors of Am., Inc. v. NLRB*, 36 F.3d 1240, 1245 (3d Cir. 1994) (first citing *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983), then citing *Control Servs., Inc.*, 303 N.L.R.B. 481, 484 (1991), *enforced*, 961 F.2d 1568 (3d Cir. 1992) (unpublished table decision)).[8]  Indeed, requiring clear waivers in management

---

[8] While we did not address it in *PG Publishing*, *Furniture Rentors* remains good law as it post-dates *Litton*, the case upon which we primarily relied in *PG Publishing* for the proposition that collective bargaining agreements should be interpreted pursuant to ordinary principles of contract law.  *See PG Publ'g*, 83 F.4th at 212-13; *accord Garcia v. Att'y Gen.*, 553 F.3d 724, 727 (3d Cir. 2009) ("We are bound by precedential opinions of our Court unless they have been reversed by an en banc proceeding or have been adversely affected by an opinion of the Supreme Court.").

rights clauses ensures fair footing for bargaining of the next CBA. *See Katz*, 369 U.S. at 746-47. And continued reservation of a carve-out to subjects of mandatory bargaining would likely slow rather than accelerate future labor negotiations.

* * *

In sum, when analyzed using ordinary contract principles, we find the management rights clause does not survive the CBA's expiration. Moreover, this conclusion is consistent with federal labor policy. Because the Board reached the same conclusion (albeit for different reasons), we will deny the petition for review.

IV.

We now turn to the General Counsel's cross-petition for enforcement. In addition to finding a violation of the Act, the Board granted the General Counsel's partial summary judgment motion, given the Company's failure to properly respond to the allegations in the compliance specification. As a remedy for violating the Act, the Board ordered the Company to "make the affected employees whole by paying them the amounts set forth [in the compliance specification]" as well as "to compensate affected employees for any adverse tax consequences of receiving lump-sum backpay awards." App. 5. The Company argues this remedy is excessive and that it was denied due process when the Board granted the General Counsel's partial summary judgment motion without giving the Company an opportunity to contest the backpay calculations. The General Counsel disagrees, and also contends we lack jurisdiction to consider the Company's

challenges to the remedy.

We begin, as we must, with our jurisdiction. Under section 10(e) of the Act, "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure . . . to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Application of this section is mandatory and jurisdictional. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982); *see also New Concepts for Living, Inc.*, 94 F.4th at 280 ("Section 10(e) is a jurisdictional administrative exhaustion requirement designed to ensure that any issue raised on appeal was first presented to the Board."); *Oldwick Materials, Inc. v. NLRB*, 732 F.2d 339, 341 (3d Cir. 1984). The Board has also promulgated regulations to flesh out section 10(e)'s requirements. *See* 29 C.F.R. § 102.46. Any party may file "exceptions" to an ALJ's decision. *Id.* § 102.46(a). The opposing party may then file an answering brief to those exceptions and/or cross-exceptions to the ALJ's decision. *Id.* § 102.46(b), (c). "Matters not included in exceptions or cross-exceptions may not therefore be urged before the Board, or in any further proceeding." *Id.* § 102.46(f). Ultimately, "[t]he crucial question in a section 160(e) analysis is whether the Board received adequate notice of the basis for the objection." *NLRB v. FedEx Freight, Inc.*, 832 F.3d 432, 437 (3d Cir. 2016) (quotation marks omitted).

In this case, we conclude, without hesitation, that our jurisdiction to review the Company's challenges to the remedy is proper. The General Counsel raised the issue of the ALJ's "fail[ure] to rule on . . . the General Counsel's Motion for Partial Summary Judgment regarding the Compliance Specification" in its exceptions to the ALJ's decision. App.

515. The issue is therefore properly before us. Full stop. *See New Concepts for Living, Inc.*, 94 F.4th at 280 ("A matter which is 'included in *exceptions or cross-exceptions*' is thereby preserved." (emphasis added) (quoting 29 C.F.R. § 102.46(f))). Neither the Act nor the Board's implementing regulation requires the party pursuing an issue on appeal to have been the one to raise it before the Board. What matters is whether "the Board was clearly on notice of the key issues in the case before us." *Id.* at 281. Here, not only did the General Counsel raise the issue of its partial summary judgment motion, but the Board actually addressed and ruled on it, thereby demonstrating its awareness of the issue. Accordingly, our jurisdiction is proper. *See also id.* at 289-90 (Krause, J., concurring) (admonishing the General Counsel for its repeated invocation of this jurisdictional argument which "exposes a troubling gap between Section 10(e) of the [Act], and the Board's regulation . . . that purports to interpret it").

That said, we agree with the General Counsel that the Board's remedy was an appropriate consequence of the Company's deficient answer to the compliance specification. When the General Counsel issues a compliance specification alleging specific amounts owed to various employees, 29 C.F.R. § 102.55, the respondent is required to file an answer, *id.* § 102.56(a). That answer must contain "highly specific information, going well beyond the requirements for answers in civil actions in federal courts." *NLRB v. Harding Glass Co.*, 500 F.3d 1, 3 (1st Cir. 2007). Specifically,

> The answer must specifically admit, deny, or explain each allegation of the specification, unless the Respondent is without knowledge, in which case the Respondent must so state, such

31

statement operating as a denial. Denials must fairly meet the substance of the allegations of the specification at issue. When a Respondent intends to deny only a part of an allegation, the Respondent must specify so much of it as is true and deny only the remainder. As to all matters within the knowledge of the Respondent, including but not limited to the various factors entering into the computation of gross backpay*, a general denial will not suffice*. As to such matters, if the Respondent disputes either the accuracy of the figures in the specification or the premises on which they are based, the answer must specifically state the basis for such disagreement, setting forth in detail the Respondent's position and furnishing the appropriate supporting figures.

29 C.F.R. § 102.56(b) (emphasis added). Moreover, "when a respondent fails to deny allegations with the required specificity, those allegations are 'deemed to be admitted true, and may be so found by the Board without the taking of evidence supporting such allegation[s], and the respondent shall be precluded from introducing any evidence controverting the allegation[s].'" *Harding Glass Co.*, 500 F.3d at 7 (alterations in original) (quoting 29 C.F.R. § 102.56(c)).

Here, the Company's answers to the paragraphs in the compliance specification were "general denials" within the meaning of the Board's regulation. For each paragraph, the Company repeated that it "[d]enies the allegations set forth in Paragraph [] of the Complaint" without providing any additional detail. *See* App. 552-55 (repeating the same answer

32

in response to paragraphs 16-86). These denials fail to "specifically state the basis for such disagreement, setting forth in detail the [Company's] position and furnishing the appropriate supporting figures." 29 C.F.R. § 102.56(b). Nor can the Company claim it lacks knowledge as to those allegations since, as the Board noted, "gross backpay owed to employees in this case is clearly within the Respondent's knowledge because its payroll department modified staff bonuses from April to November 2020." App. 4. Because the Company's denials were clearly deficient under the Board's regulations, "[t]he Board was justified in . . . awarding partial summary judgment based on the allegations that were deemed admitted to be true." *Harding Glass Co.*, 500 F.3d at 7.

The Company claims it was not given the opportunity to address the partial summary judgment motion prior to the Board ruling on it because the motion was mooted by the ALJ's finding of no liability. This is plainly inaccurate. *First*, the compliance specification itself clearly alerted the Company of its "answer requirement" that "a general denial is not sufficient" and that "if an answer fails to deny allegations . . . in the manner required under [the Board's regulations] . . . the Board may find those allegations in the Second Amended Complaint and Compliance Specification are true and preclude [the Company] from introducing any evidence controverting those allegations." App. 295-97; *see Harding Glass Co.*, 500 F.3d at 7 (enforcing the Board's grant of partial summary judgment because "Harding had fair notice of the costs of its evasiveness"). *Second*, the General Counsel gave the Company the opportunity to correct its clearly deficient answer prior to filing its partial summary judgment motion, but the Company declined to do so. *Third*, the ALJ explicitly invited the Company to oppose the General

Counsel's partial summary judgment motion and/or correct its deficient answer at the conclusion of the hearing, but the Company declined to do so. And *fourth*, the General Counsel explicitly renewed its partial summary judgment motion in its exceptions to the ALJ's decision, but once again, the Company declined to do so. The Company was therefore given four opportunities to address its deficient answer, yet it failed to do so. Any due process challenge is therefore meritless.[9]

But even if we were to reach the merits, we would not find the Board's remedy excessive. The Act gives the Board the power to "take such affirmative action . . . as will effectuate the policies of [the Act.]" 29 U.S.C. § 160©. And we accord broad deference to the Board to fashion make-whole remedies. *See Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964) (the Board's authority to issue remedies is a "broad discretionary one, subject to limited judicial review"); *see also 1621 Route 22 W. Operating Co.*, 825 F.3d at 147 ("In reviewing the Board's [remedy] determination, . . . our 'judicial role is narrow,' and an order of the Board 'must be enforced' if it is rationally 'consistent[t] with the Act' and 'supported by substantial evidence on the record as a whole.'" (alteration in original) (quoting *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978))).

---

[9] *See Harding Glass Co.*, 500 F.3d at 3 ("This case has cautionary lessons for counsel about the costs of minimalist responses to [the General Counsel's] allegations. Here, the company failed to comply with the Board's rules for answering compliance specifications. . . . We [therefore] reject the company's arguments and enforce the Board's order.").

34

Finally, we will enforce the Board's order with respect to the Company's failure to respond to the information request. The ALJ found the Company failed to provide the requested information, that the information was "presumptively relevant and may be necessary for the Union to advocate [for] its represented members at the pending grievance," App. 17, and that the Company therefore violated the Act by failing to provide the information. Neither party raised the issue of the information request before the Board. Nor does the Company address the issue in its petition for review or its reply to the General Counsel's cross-petition. The issue is therefore forfeited.

## V.

For the reasons set forth above, we will deny the Company's petition for review and grant the General Counsel's cross-petition for enforcement.